## MRS. BERTHA COPPENGER, Admrx. v. BABCOCK LUMBER & LAND COMPANY.

Eastern Section. April 7, 1928.

Petition for Certiorari denied by Supreme Court, July 6, 1928.

Kramer and Kramer, of Maryville, and Watkins & Wagoner, of Loudon, for plaintiff in error.

Chas. H. Smith, of Knoxville, and Gamble, Crawford & Goddard, of Maryville, for defendant in error.

PORTRUM, J. Two men were incinerated in forest fires which swept over portions of the Great Smokies in the early fall of 1925. These fires burned for weeks and were of grave public concern, continuously newspaper comment was given of the course of the fire and of the attempts made by fire-fighters to check it. The fires that we are concerned with were burning in Monroe county and over a portion of the mountains owned by the Babcock Lumber & Land Company. This company was removing timber from the land and had camps and logging crews in the mountains at the time; it had constructed logging railroads up the coves and over the sides of the mountains where it was practical, for the purpose of bringing out the logs which were transported to a railroad station and from there to its mills near Maryville, Tennessee.

G. C. Millsaps had a contract with the Babcock Lumber & Land Company to cut and log parts of this timber, and he had a camp up in one of these coves or valleys where his employees lived during

the operation on this particular boundary. He had under his employ Frank W. Coppenger and many others, who lived at the camps referred to. It is not shown how long Coppenger had been working under Millsaps, but it is shown that he had been engaged in this timber operation which belonged to the Babcock Lumber & Land Company for a period as long as seventeen years, so he was an experienced woodsman. On the day when Coppenger was burned alive, which was Sunday, September 6, 1925, he had been engaged with others in fighting fire on the mountains lying to the east of the Millsaps camp where he lived. His foreman was a man by the name of Graves who, as will be hereinafter seen, was with Coppenger when he was burned, and was the second man referred to as being destroyed.

It is necessary to here detail the topography of the country in order to understand the motives prompting the conduct of these fire-fighters. The general range of mountains runs north and south, but from the main body short mountains or prongs run out in a western direction, and on the sides of these prongs grows the timber that was being removed by the crew of men referred to. These prongs can be represented as outstretched fingers, and between the prongs the company had extended its logging railroads, and the timber is brought down from the sides of the mountains and carried out on these roads. In the operation in question, the roads converge at a place called Jeffreys. As appears from the map and record, the first branch of the road running due east from Jeffreys is known as the north prong. The road branches off from the north prong a short distance from Jeffreys and runs around the end of what we will call the north prong mountain for about a mile and a half to a place called Eagle Gap. There the road branches again and a branch runs off east and is known as the south prong and lies between what we will call the north prong mountain and the south prong mountain. This road runs up about one mile, climbing a grade continuously to the Millsaps camp. Then a short distance beyond, a side-track, which it will be necessary to refer to hereafter, is located. The road here is mounting the mountain rapidly and the grade becomes so steep it is necessary to lay the track back and forwards upon the side of the mountain, a method called "switch backs". That is, the train backs up on the side of the mountain and runs forward and then backs up again and in this way it is able to make the severe grade. The track is/somewhat in the form of a "W" and lies on the north prong mountain.

Returning now to Eagle Gap, the road branches off and runs around the south prong mountain and up another ravine or cove, past a camp known as Tucker's camp. The south prong mountain is between Millsaps' camp and Tucker's camp.

The forest fire had been burning for some weeks prior to the Sunday in question, and had burned north of the north prong mountain, but at times had been under control. On this day it was raging

fiercely and the wind was carrying sparks and burning bark towards the top and over this mountain and in the direction of the Millsaps camp. The crew fighting the fire was unable to check its course and as it gained headway and burned to the top of the mountain, the superintendent ordered the evacuation of Millsaps' camp, and some thirty women and children started on foot following the railroad to Eagle Gap. Because of the impending danger, it was thought advisable that the women and children should not wait but should leave the camp immediately in order to get beyond and below the fires. Word was also sent to Eagle Gap to send up a train in order to carry out the household goods of the logsmen who lived at Millsaps' camp. The women and children went out of the camp between twelve and one o'clock of the day; and the logging engine, pushing four flat cars, left Eagle Gap about this time to go up and bring out some explosives and camp supplies, as well as the household goods of the men. This train could only run about eight or ten miles an hour, being constructed for power and not for speed, and its right of way was strewed with leaves and the tops of hemlock throughout its distance, and the season being very dry, this matter upon the road bed was very combustible. The engine is shown to have thrown a large number of sparks, and it was their custom in dry weather to follow up the engine by sending a man with a bucket, who dipped water from the branch nearby and put out the fires started by the flying sparks. On this day two men were started with buckets from Eagle Gap and followed behind the train to Millsaps' camp but the train out-distanced them, and they were unable to extinguish the fires. The campers coming down the track did extinguish several of these fires. This engine and train passed through Millsaps' camp, and ran a short distance beyond to the switch, to what is known as the "submarine". This is where a small branch of water was made to run between two ties of the track and the engine would let down a hose and suck up the water, and this was the method of procuring water for the engine. This train attempted to take water at this place when attention was called to the fact that a small fire had broken out in a brush-heap on the edge of the track, about six hundred feet down the track and beyond Millsaps' camp.

The engine ran back and attempted to put out this fire with the hose from the engine but, for some reason, the hose would not work or became disconnected and could not be used. The crew was unable to control this fire, which spread rapidly and the train was ordered immediately to the camp to load the plunder. This took some little time, probably forty-five minutes, and during the time this fire had spread across the tracks and it had advanced to the outskirts of the camp, and was burning the stables. It was found impossible to run the train through the fire in order to get below the fire and to Eagle Gap, and since there were some more homes higher up and it was necessary to take the plunder from these homes, the train was ordered

moved up the mountain. The fire was burning rapidly on both sides of the track and up the mountain towards the train. As the train pulled out, the hands were on the flat cars. The overseer, Graves, walked along beside the train until it came to the side-track heretofore referred to. He then started off in a trot down the side-track, going to a logging road or trail which led from this side-track across and over the south prong mountain towards Tucker's camp. As he ran, his companions on the train hollered to him, to determine his purpose. He said nothing but, pointing towards the trail over the south prong mountain towards Tucker's camp, he waved his hand over his head in what is known as the "high sign".

The train was moving on and when it had run thirty or forty feet towards the switch-backs, Coppenger jumped from the train and started in the direction of Graves, following him across this mountain. Then a man by the name of Cassady called out: "Boys, come back and get on the train with us, you are going to get burned up".

Coppenger ran down the side-track and down a trail, crossing a little branch, where he wet his handkerchief and put it over his face to protect him from the smoke, but said nothing and ran on. Then the man called out again: "Bill, my God! Come back, you and Frank, there is no chance for you to get out that way." They only motioned towards the fire and ran on. The train pulled away and was less than half a mile away from the camps and on the switch-backs when the fire swept over the territory and catching the train when it ran towards the fire in order to run back and forth on the higher tracks, and burned the train. Some of the men got off of the train when it reached the switch-backs and before it ran in the direction of the fire. Others remained on until the train was caught afire, when they got off. There was a portion of the territory in what is known as the switch-backs that had been burned over, and the men were seeking safety here, but on the opposite side of the mountain the fire was still raging and the smoke was pouring up over the mountain. Those who followed the train to the switch-backs were saved, some of them by lying in culverts and wet places along the side of the track during the remainder of the day and night and until they were able to make their way across the mountain and to safety.

Graves and Coppenger were only able to run about five hundred feet from the place where they were last seen. They were found within fifteen feet of each other, and burned almost beyond recognition. Coppenger was dismembered and disemboweled. The fire was said to go faster than a horse could run and to burn the dead tree tops and mountain laurel, with a great cracking and roaring. It made a sound like peals of thunder, as one of the witnesses testified. The fire was coming at less than a quarter of a mile from the men when they left the train and started to follow the trail across the mountain.

Bertha Coppenger, the widow of Frank Coppenger, now sues as his administratrix, to recover for his death, for the use of herself and four minor girl children. Her declaration contains four counts, and in the first it is alleged that the defendant company owned and operated saw mills near Maryville, where it manufactured lumber cut in the mountains of Monroe county from the timber tracts in question and its line of railway was used in transporting said timber and supplies to and from its camps and its mills; that said train and cars were operated over the lines of railway on the day in question recklessly, carelessly and negligently, through a vast area of woodland, which was especially susceptible to fire, in an intensely dry season, with its road way littered with leaves, dead timber and brush, which the company negligently permitted to accumulate upon the road way, by the negligent emission of sparks from a negligently constructed engine, which negligence caused the fire which caused the death of Coppenger, who it is averred was an employee of the defendant.

The second count contained the same allegations as the first, with the exception that Frank Coppenger was the employee of G. C. Millsaps, and that in order to prevent the spread of the fire which was raging in the mountains and about to destroy the valuable timber of the defendant and its logging camps, outfits and equipment, the defendant company employed a number of men, including one Frank W. Coppenger, for the specific purpose of fighting said fire, and that the train negligently emitted large quantities of cinders, which started the fire in the combustible matter along the track and was about to destroy the train when it was necessary for Coppenger to leave the train, his avenue of escape being cut off, and as a consequence of which he was burned to death.

The third and fourth counts contain matters not necessary here to refer to because the Circuit Judge directed a verdict on each of these counts.

The case went to trial before the Honorable D. A. Vines, Circuit Judge, sitting by interchange with the Honorable Pat Quinn, when a verdict was rendered and a judgment entered for the sum of $15,000. The defendant filed its motion for a new trial which being overruled, he prayed and was granted an appeal to this court, and now assigns the following errors, the first being that the court erred in failing to direct a verdict on the first and second counts, at the conclusion of all the evidence in the case. The second is that there is no evidence to support the verdict. These two assignments will be considered and treated together. The following propositions are advanced as arising under these assignments:

(1) There is no proof in the record that the defendant's locomotive set out the fire on the south prong of the railroad;

(2) That if this fact is shown, there is no proof that the fire thus set out by the defendant's locomotive caused the death of Frank W. Coppenger;

(3) That even if there is proof in the record to show that the defendant's locomotive set out the fire in question and that said fire was the cause of the death of Frank W. Coppenger, that the plaintiff can not recover because said Frank W. Coppenger was guilty of proximate contributory negligence; and on this question it denies that there was sudden peril or emergency which can be taken into consideration as excusing the negligence of Coppenger.

There is no eye witness who testifies that he saw the train emit the spark that set the fire to the brush-heap on the side of the railway which is claimed to have spread and destroyed Frank W. Coppenger. This fact has to be proved by circumstantial evidence. And it is insisted that there is proof in the record showing that the fire was raging upon the mountain and was blowing sparks and bark a long distance in its course in front of it; that certain fires were started by sparks blown from this fire on both sides of the railway in question, and since this particular fire could have been started from either source, that is, from the sparks from the engine or sparks from the mountain fire, the jury is not permitted to conjecture and guess which of the fires started the fire in question, therefore, there is no evidence to support this verdict.

We are aware of the rule of law that in order to prove a fact by circumstantial evidence, the circumstances must exclude every other reasonable hypothesis. The rule, as stated by Bailey on Master and Servant 508, is:

"It may be correctly stated as a rule in all cases that proof of an alleged act or omission as causing injury is not sufficient as long as other causes exist and were present which might as well have caused it. Surmise and conjecture cannot supersede proof. There must exist some degree of certainty. There need not be absolute certainty, free from reasonable doubt, but sufficient must be shown to overcome or more than balance any presumption of the other causes having caused it."

This is but a re-statement of the rule as adopted by our courts, which is that the circumstances must exclude every other reasonable hypothesis. The defendant did adduce proof that sparks did blow from the forest fire on the mountain and set out fires on both sides of the track, and if it did this, then it may have set out the fire in question; and if this be true, the jury had no way to determine which was the cause, and its determination was a mere guess. But, was it not a question for the jury to weigh the evidence and first determine if such state of facts existed, that is, was it true that sparks were flying from the forest fire to the road bed of the railroad? If the jury had evidence before it from which it could conclude that this

state of facts did not exist, then its finding was not based upon a guess but upon evidence.

The first inquiry then is: was there evidence before the jury from which it could conclude there were no sparks flying from the forest fire to set this fire in the brush-heap?

The plaintiff introduced a large number of witnesses stating that there was no fire upon the right of way immediately before the train went by, in fact, the train crew and those on the flat cars saw no fire along the right of way as the train went up, but immediately after the train passed they saw the fire in question and went back and attempted to extinguish it but were unsuccessful. Some witnesses testify that the engine was emitting a great number of large sparks, one in question being almost as large as the witness' thumb, which fell upon a dry log and set it afire, which he extinguished; one witness testified that he was looking and saw the fire in the brush-heap when it first started up, and that the fire on the mountain was more than twelve hundred feet away and he did not see any sparks flying from the forest fire. If this is true, then at the time the fire was started in the brush-heap, there were no sparks flying from the forest fire, and a situation did not exist raising a doubt as to which cause started the fire in the brush-heap.

There is some evidence negativing a situation whereby the fire could have been started from one of two causes. In other words, there is some evidence eliminating the theory that the fire was started from the forest fire. Then the question remains: has the plaintiff adduced any evidence tending to show that the fire was negligently started from the sparks emitted from the engine?

One witness testifies that the spark arrester was attached to the outside of the smoke stack and not in use, and that the spark arrester was not in good order because if it was it would be impossible to emit sparks of the size the engine was throwing. It is true the defendant put on witnesses who testified that the engine just came from the shop and it had a spark arrester of exceedingly small mesh; but the defendant did not put on any proof that showed that sparks of the size in question could be thrown from an engine with this spark arrester. In fact, the contention was that such sparks would not be thrown from the engine. So, there was a sharp issue for the jury. If one theory was correct, the other was false. If the spark arrester was in place, as insisted by the defendant, then the engine could not throw the large sparks in question. The jury found that the engine did throw the large sparks and, therefore, the spark arrester was not as claimed by the witnesses for the defendant.

An attempt is made to explain the presence of a spark arrester upon the train, which is, that it was used only in emergency in order to get the engine in when it was throwing sparks. It was throwing sparks on this occasion and it seems that this spark arrester should

have been put in place. It is said though that the engine would not operate properly with both spark arresters in place.

Since we find that there is evidence of the negligent use of a defective spark arrester, it is not necessary that we go further and find as another item of negligence the fact the company permitted trash and brush to accumulate upon its right of way. These log roads are laid out in the mountains and where the property of third persons is not involved perhaps the company is not under as great a duty to keep its right of way clean to avoid the spread of fire as is required of commercial railroads, (R. R. Co. v. Lumber Co., 130 Tenn., 354) although there is some authority holding that log roads are required to keep the right of way clean, but in those cases it appears that the fire spread to adjoining landowners. Craft v. Timber Co., 132 N. C., 151, 43 S. E. 597; Thomas v. Hammer Lumber Co., 153 N. C., 351; 32 A. L. R. (N. S.) 5846.

At any rate, the company is under the duty not to permit its right of way to become a menace to the life and safety of its employees, for the employees are entitled at all times to a reasonably safe place to work. It is shown by the defendant's proof that it was the custom in dry weather to send men following the engine with buckets to dip water and put out the fires started by the engine. It seems to us that a more efficient way would have been to send men to clean the right of way. If the engine is required to be equipped with modern equipment then it seems the company should be required to use the best method in preventing the danger. In this case, it sent two water boys behind the engine who were to follow it from a distance of about a mile, and since two boys cannot walk faster than one boy, it would have been safer to have carried one boy about half the way and put him down in order that he could follow the train from there on.

It is next said that there is no proof that this particular fire caused the death of Frank W. Coppenger. The plaintiff introduced a witness who testified that this particular fire spread over the track and spread rapidly over the territory over which the dead men went, that is, he testified that this particular fire that spread from the brush-heap was the fire that burned Coppenger. This was not an unreasonable statement. Any one there could have and probably did see and follow the course of the fire, and could testify as a fact that this fire did destroy Coppenger. We are not authorized to disregard this testimony, and must conclude that there is evidence supporting the conclusion that this particular fire destroyed Coppenger.

The third contention is that the conduct of Coppenger was negligent, contributing proximately to his death and, therefore, he can not recover. This is answered by saying that he was confronted with a sudden peril or emergency and if he acted negligently he was excused.

There is no question but what some of the people on the train were of the positive opinion that the safest, or the only way of escape was to follow the train over the switch-backs and the act of Coppenger and Graves in attempting to cross the mountain was an act of folly, making certain their death. It turned out that they were correct in this opinion, but had the wind changed we might now entertain a different conclusion. The conditions as they presented themselves to Coppenger and Graves at the time were such that reasonable men might conclude as Coppenger concluded. In fact, Graves, who was the foreman and leader, concluded that the safest way was across the mountain. It at least was the direction in which there was no fire because fire was burning on the other side of the mountain from the switch-backs. While it is argued with much force that Coppenger knew the switch-backs were burned over and were safe and he deliberately took a course of danger, yet we think it was a question for the jury to say whether or not his conduct was negligent. He at least was going away from the fire, while his companions on the train were journeying into the fire. But, conceding that Coppenger was negligent in leaving the train, then we believe it a question for the jury to determine whether or not a condition of emergency existed which excused his negligence. Certainly the danger was imminent, and his decision must be made quickly. The train was moving away carrying him in one direction and his foreman, Graves, was travelling rapidly in another direction. He must decide quickly whom he would follow. He had but short time to deliberate, but deliberation may have been of little benefit to him, for he might have found himself in the same quandary had he had time to deliberate ten minutes.

The doctrine of sudden peril is stated as follows in 29 Cyc, 521:

"In order to relieve a person from the consequences of his own acts on the ground that they were done suddenly and in impending danger, there must either be a real danger or the circumstances must be such as to create in his mind a reasonable apprehension of danger, and the injured person must be placed in such position that he has to choose on the instant in the face of the impending peril. If there is time for him by the exercise of reasonable care to withdraw to a place of safety, he cannot recover if he does not do so."

Of course, deliberation in this instance contemplated that the injured party would discover a safe way of escape. If deliberation did not present this safe way of escape, then perhaps deliberation is not so important. But in this instance, we think the facts show that the deceased had to "choose on the instant" what course to take. The rule as laid down in 20 R. C. L., page 134, is as follows:

"In the foregoing discussion it has been noted that a person is bound to use his intelligence and senses to discover dangers and upon their discovery to exercise diligence to avoid an injury therefrom. But while he is bound to take active measures to preserve himself from

impending harm, he is by no means held to the same judgment and activity under all circumstances. The opportunity to think and act must be taken into consideration. And although he may not have taken the safest course or acted with the best judgment or greatest prudence, he may yet recover for injuries sustained if he can show that he was required to act suddenly or in an emergency, without opportunity for deliberation.''

Our cases recognize this rule and in R. R. v. Burley, 80 Tenn. 45, it is stated as follows:

''And if, in the excitement of the moment, the deceased lost his own presence of mind and adopted a mode of self-preservation which proved to be most unfortunate for him, it is no excuse to the company whose negligence in employing or retaining an incompetent servant caused the disaster.''

And in Marble Co. v. Black, 89 Tenn. 118, it is said:

''That the deceased in the excitement of the moment, lost his presence of mind, and, in an honest effort to save his life, by mistake pursued the course to lose it, it is no excuse for the negligence of the defendant which caused the disaster.''

In the later case of Chattanooga Electric Railway Company v. Cooper, 109 Tenn. 308, the court said:

''It is well settled by all the authorities that a plaintiff put in a place of sudden peril by the negligent act of a defendant, who, losing his position, takes the wrong step, and is injured, will not have such step imputed to him as contributory negligence.''

Other cases discussing this question are: R. R. v. Hugh, 97 Tenn. 624; R. R. v. Ridley, 114 Tenn. 727; and Doyle v. Chattanooga, 128 Tenn. 433.

This case is distinguished from the case of Chattanooga Light & Power Company v. Hodges, 109 Tenn., 331. There an employee was injured in a burning building. He discovered the fire and ran out to a place of safety. Then he ran back in the building for the purpose of 'phoning the fire department and was unable to again escape unharmed. In discussing the facts of this case, the court held that the negligent construction of the building which caused the fire was not the proximate cause of the injury, that is, when the employee escaped to a place of safety the casual connection had been broken, and that a sudden emergency would not excuse him for his negligence in returning to the burning building. He was not seeking to escape injury himself but was seeking to preserve the property of his employer.

In the instant case, the deceased, Coppenger, was not in a place of safety at the time he was required to choose which course to take, the casual connection had not been broken, and the rule as announced in the Hodges case is not applicable.

The third assignment of error is:

"The trial judge erred in charging the doctrine of sudden peril or emergency in the following language:

" 'And in this case, gentlemen of the jury, I instruct you if you believe by a preponderance of all the evidence in the case that the plaintiff's intestate, Frank W. Coppenger, through the negligence of the defendant was placed in a situation where he must adopt a perilous alternative or where in the terror of an emergency for which he was not responsible and for which the defendant was responsible, if he acted negligently and suffered in consequence thereof, such negligent conduct would not necessarily be contributory negligence such as would bar a recovery, for the reason that persons placed in a great peril are not required to exercise all of the prudence of mind and carefullness which, are required of a careful, prudent man under ordinary circumstances, provided the negligence of the defendant was the proximate cause of the injury. And if plaintiff's intestate by taking a different route might have escaped injury, this does not of itself make him guilty of contributory negligence such as would bar recovery.'

"The foregoing charge is erroneous in that it does not state correctly the law in reference to the condition which excuses one from contributory negligence when placed in sudden peril. Furthermore, it was erroneous to charge the jury on the question of sudden peril or emergency because there is no allegation in either of the two counts of the declaration submitted to the jury averring that the plaintiff was placed in sudden peril or emergency which will excuse him from contributory negligence."

The first criticism is that the charge does not correctly state the law in that the court did not direct the jury that the deceased must be confronted with a sudden peril and that the element of suddenness is essential to the doctrine. We think this criticism is not well founded. The court used the phrase: "adopted a perilous alternative or where in the terror of an emergency", this is equivalent language to a sudden peril. Funk & Wagnall's Dictionary defines emergency: "1. A sudden condition calling for immediate action."

It was not necessary for the plaintiff to set out in the counts of her declaration facts negativing the defendant's plea of contributory negligence. R. R. v. Davis, 104 Tenn., 441.

The last assignment of error is that the court erred in not granting a new trial because the verdict is so excessive as to show prejudice, passion, corruption and caprice. The pleader has this to say in this assignment:

"Now the jury awarded the plaintiff a verdict of $15,000. If the plaintiff invested this sum at six per cent interest, she would receive $900 per year, that is, $120 a year more than her husband was earning. And no part of this $900 will be consumed for living expenses of the deceased husband. During the expectancy of her husband's life,

twenty-seven years, this $15,000 will produce an income for plaintiff amounting to $24,300, or $3264 more than the deceased would have earned if his earning capacity had not changed and he lived his full expectancy. Above all this, the plaintiff would still have the $15,000 principal untouched."

The deceased was shown to be a man forty-one years of age, and in moderate health. His expectancy was twenty-seven years, and he earned $780 per year. Counsel for the defendant in error have cited a long list of cases showing various sums allowed by different courts to refute the argument above quoted. These cases demonstrate the uncertainty of the actions of a jury in determining the value of life. We recognize that there is no standard to measure life, but if the court is going to understake to fix the commercial value of life, that amount can be determined by the earning capacity of the life. The jury cannot fix a sum to represent the love and care of a father, therefore the court cannot take this in consideration in gauging the verdict.

We believe it sufficient to return to the family an amount equivalent to what the deceased would have brought in had he lived, and to burden industry with a greater sum will be to penalize it because of negligence growing out of, in most cases, the conduct of a fellow servant or superior servant to the injured man.

If we treat the deceased as a man of good health and entitled to the full expectancy of twenty-seven years and, notwithstanding that he was a day laborer, give him credit for six days out of every week, regardless of the weather, for the full term of twenty-seven years, then to fix a sum which will yield a wage covering this period is all that the plaintiff is entitled to.

The Mutual Life Insurance Company of New York's mortality tables show that the following sum, payable yearly, will discharge one dollar in twenty-seven years, to-wit: .0757, so to mortize a fund so as to yield yearly a sum equivalent to the deceased wages, it is found that $10,304 will yield such a sum. That is, this sum put at six per cent interest will pay the widow and children the yearly wage of the husband for twenty-seven years, at which time there will be no part remaining.

We think the recovery in this case should not be larger than $10,500, that the verdict is clearly excessive to the extent of $4500, and, therefore, a remittitur of $4500 is suggested. A judgment will be entered for $10,500 and the case affirmed, provided the remittitur is accepted. The plaintiff in error will pay the costs of the appeal.

Snodgrass and Thompson, JJ., concur.