**Roy D. LATHAM, Administrator of the Estate of Brenda Sue Gaddis, Deceased**

v.

**TECHNAR, INC., et al.**

**Civ. No. 3–74–145.**

United States District Court,
E. D. Tennessee, N. D.

Oct. 29, 1974.

J. D. Lee, Madisonville, Tenn., Roy D. Crawford, Maryville, Tenn., for plaintiff.

Robert L. Crossley, George Morton, Jr., Francis A. Cain, Cheek, Taylor & Groover, Knoxville, Tenn., for defendants.

## MEMORANDUM

ROBERT L. TAYLOR, District Judge.

Defendant, Allied Chemical Corporation (Allied), in its post-trial motion, has moved the Court to set aside the verdict and judgment in this wrongful death case. Alternatively, Allied has moved for a new trial and requests a remittitur of the jury verdict. Allied, prior to the trial of this case, moved for summary judgment on essentially the same grounds it presently urges. A verdict was returned by the jury in favor of plaintiff in the amount of $300,000.-00.

The nature of Allied's motion requires the Court at this time to briefly set forth the background of the case.

Plaintiff is a resident of Tennessee and is the administrator of the estate of Brenda Sue Gaddis, who also was a resident of this state. Allied is a foreign corporation doing business in Tennessee and has its principal place of business outside this state. Allied acquired all of the stock of Jim Robbins Seat Belt Company (Jim Robbins), located in Knoxville, prior to July 1, 1973, the date of the accident. Jim Robbins manufacturers seat belts and, although its stock was owned by Allied, held its own separate Delaware charter on July 1, 1973. Among the various divisions of Allied is the Automotive Products Division, which, in turn, includes the air bag[1] operations and seat belt operations of Jim Robbins. It is this interface and commingling between the corporate entities of Allied and Jim Robbins that is the focus of Allied's defense.

As a part of its air bag operation, Allied opened a factory in Knoxville essentially adjacent if not a part of the Jim Robbins plant, where it manufactured pressure switches, an integral component part of the finished automobile air bag system. The manufacturing of these switches consisted of a step-by-step process of assembly, testing and visual inspection of the pressure switch. The last step in the inspection process was conducted by hourly employees, such as Brenda Sue Gaddis in this particular instance.

In need of a specialized pressure chamber for testing the finished switches, Allied, in the Fall of 1972, had Technar, Inc. of California design such a device. Allied worked with Technar in the design of the chamber and with Strain Engineering Company, also of California, in the actual manufacture. In October 1972 the two finished chambers where shipped to Allied's air bag operations in Knoxville. The first chambers (called Allied chambers) were cylindrical in shape, and consisted of two stainless steel pipes, sixteen inches long, three and one-half inches in diameter, with one end permanently sealed. The operator of the chamber would insert a tray of assembled switches in the open end of the cylinder, seal the opening by threading, first by hand then by wrench, an end plug until appropriately tight, and then pressurizing the sealed chamber with nitrogen to approximately 2500 pounds per square inch (p. s. i.). Subjecting the air bag switches to this pressurized environment enabled the operator to determine whether the finished product properly functioned.

In February 1973 Allied requested Technar to design a third chamber for the testing of Eaton switches. This chamber was essentially the same as the former Allied chamber but because the Eaton chamber was to be operated at greater pressures (3200 p. s. i.) than the Allied chamber, it was to be proportionately longer. This chamber was designed by Technar, manufactured by Strain and shipped to Knoxville in April or May 1973.

Because the Eaton, or second design, chamber was longer and built to be subjected to higher pressures than the Allied chamber, the Eaton end plug was

---

1. Allied was involved in the development and manufacture of automobile air bags, protective interior cushions which automatically inflate upon a calculated degree of impact.

likewise larger, both with respect to the length of the end plug and the size of the hexonal nut attached to the plug. Thus, the smaller Allied plug was designed to fit the smaller Allied chamber, and the larger Eaton plug was designed to fit the larger Eaton chamber. Moreover, the Allied plug could not be fully threaded into the Eaton chamber.

On July 3, 1973, Mr. Randolph, who had been employed by Allied only three weeks before, replaced the usual Eaton chamber operator who was on vacation leave. As the replacement operator, Randolph had received only brief instructions a few days before on the operation of the Eaton test chamber. On one occasion during the day Randolph loaded the Eaton chamber with a tray of Eaton switches; however, instead of threading the Eaton end plug into the loaded chamber, he threaded the smaller Allied end plug. Upon pressurizing the Eaton chamber to 3300 p. s. i., the end plug was blown out of the chamber, resulting in the explosion which caused plaintiff's death.[2] Randolph suffered a momentary loss of hearing and a torn shirt. He testified that he didn't know the danger that the capsule could do as he was just getting started in industrial engineering.

Defendant Allied has persistently contended both before and during the course of this trial that, as a matter of law, 50 Tenn.Code Ann. 908 is plaintiff's sole and exclusive judicial remedy for the wrongful death of Miss Gaddis. The Court has maintained that, under the limited circumstances of this case, Allied is not within the protective scope of Section 908. Section 908 must be read in light of Section 903, which provides:

"Every employer and employee subject to workmen's compensation law

shall, respectively, pay and accept compensation for personal injury or death by accident arising out of and in the course of employment without regard to fault as a cause of the injury or death."

The "exclusivity" provision, Section 908, provides:

"The rights and remedies herein granted to an employee subject to the Workmen's Compensation Law on account of personal injury or death by accident, including a minor whether lawfully or unlawfully employed, shall exclude all other rights and remedies of such employee, his personal representative, dependents, or next of kin, at common law or otherwise, on account of such injury or death."

Allied contends, under a number of theories, that, in the final analysis, Allied was the employer of Brenda Sue Gaddis. That is to say, Allied was the employer of decedent within the meaning of Section 902:

"(a) 'Employer' shall include any individual, firm, association or corporation, or the receiver, or trustee of the same, or the legal representative of a deceased employer, using the services of not less than five (5) persons for pay, and in the case of an employer engaged in the mining and production of coal, one (1) employee for pay. If the employer is insured, it shall include his insurer, unless otherwise herein provided."

In support of its position as the employer of Miss Gaddis, Allied presented to the Court and the jury the following facts:

1. The employment application of Brenda Sue Gaddis, dated 10–21–71, bearing both the names "Allied Chem-

2. The Allied end plug was propelled across the room, or some fifty-five feet. The weight of the Allied plug and the distance it traveled are indicative of the explosion's force. Although one individual was seriously injured by the actual impact of the end plug, the cause of Miss Gaddis' death was attributed to the extreme concussive force of the explosion.

ical" and "Jim Robbins Seat Belt Co."[3] (Exhibit 10)

2. Various work posters bearing the name Allied Chemical Corporation.

3. Newspaper "Want Ads,"[4] describing various Jim Robbins employment opportunities. At the bottom of some of these ads is the following:

"JIM ROBBINS SEAL BELT CO.

A subsidiary of Allied Chemical Corp.

1601 Mid Park Lane

Knoxville, Tenn. 37921" (Exhibit 9)

4. Major medical and life insurance enrollment cards bearing the name Allied Chemical Corporation and signed by Brenda Sue Gaddis. (Exhibits 3 and 4)

5. Two photographs of two trucks bearing the name Allied Chemical and one photograph of the building in which Miss Gaddis worked, upon which was mounted an Allied Chemical sign. (Exhibits 8, 12, 21, 24).

6. Descriptive insurance brochures bearing the name Allied Chemical. (Exhibits 6, 7)

7. Allied Chemical Corporation's workmen's compensation insurance policy with Travelers Insurance Company, which included Jim Robbins Seat Belt Co. among some 122 other companies similarly listed as named insureds under the policy.

Also introduced were two payroll paychecks, each bearing the name Allied Chemical in the upper lefthand corner. Significant to the Court, however, is the difference between the type of check paid to Mr. Randolph (hired by Allied), Exhibit 2, and the type of check paid to Miss Gaddis (hired by Jim Robbins), Exhibit 1. In the former, the check, in addition to the name Allied Chemical

Corp. appearing in the corner, is captioned "Automotive Products Division," while in the latter, the check is captioned "Jim Robbins Seat Belt Company." The court cannot turn its back to the fact that the principal name appearing on the face of a payroll check has a major influence upon a wage earner. Finally, submitted to the Court and jury was the collective bargaining agreement entitled, "AGREEMENT between JIM ROBBINS SEAT BELT COMPANY and TEXTILE WORKERS UNION OF AMERICA AFL–CIO . . . January 1, 1973, Knoxville, Tennessee." (Exhibit 20) Brenda Sue Gaddis was a member of this union and her signature appears on the first inside page of the printed agreement. By agreement it was also submitted that Allied and Jim Robbins filed separate payroll withholding tax returns, and, in the case of Jim Robbins, Brenda Sue Gaddis was listed as an employee on their return.

Barbara Amburn, a co-employee of Brenda Sue Gaddis and also injured in the test chamber explosion, testified that it was her understanding that she was hired by Jim Robbins. Cordia Goin, a member of the Executive Board of the Textile Workers—Chapter 17 and a member of the negotiating team, stated that it was her understanding that her union was bargaining with Jim Robbins Seat Belt Company and not Allied Chemical when the collective bargaining agreement was initially formulated. Butler, President of the Union, however, stated that he was aware that the negotiated contract had to be submitted to Allied for final approval. When asked who had the power to hire and fire Brenda Sue Gaddis, Butler answered Jim Robbins. Mr. Larry Woods, who worked in the same room as Brenda Sue

---

3. The Court notes the application form is designated at the bottom left-hand corner as JRSB–C 167. Assumably, the initials stand for Jim Robbins Seat Belt Company.

4. The value of these ads in determining the relationship between Brenda Sue Gaddis and Allied Chemical on July 3, 1973 is suspect since all the ads bear 1972 or 1973 dates.

As noted above, Brenda Sue Gaddis sought employment with Jim Robbins on 10–21–71. (Exhibit 10) In the absence of any evidence indicating that she was seeking employment elsewhere between 10–21–71 and 7–3–73, the date of her death, there is little likelihood that she would have read the ads included in collective Exhibit 9.

Gaddis and who trained Dale Randolph prior to taking a leave of absence in July 1973, stated that he was an hourly employee (vis-a-vis a salaried employee) and understood he was working for Jim Robbins. Mr. Sweet, the supervisor of Brenda Sue Gaddis, stated he interviewed Miss Gaddis and made the decision to use her in the air bag program, and, accordingly, Miss Gaddis transferred from seat belt activities to the air bag program where she continued to receive her hourly wage on the Jim Robbins paycheck. Because the Court views the testimony of Mr. Sweet, a witness of defendant, as significant, it is worth repeating at this point relevant portions of his cross-examination:

"Q. Mr. Sweet, when you interviewed and hired Brenda Sue Gaddis, this was in—did she come in in response to a Jim Robbins advertisement?

"A. No, she worked for Jim Robbins Seat Belt.

"Q. Before you came there?

"A. Before I came there, yes.

\* \* \* \* \* \*

"Q. In other words, you came there and you were there in April of 1973?

"A. Right.

"Q. And she was killed on July 3, 1973?

"A. Right.

"Q. About three months later?

"A. Yes.

"Q. Now she was there and had been there working for Jim Robbins Seat Belt Company?

"A. In the Philco Building, yes; Philco Building.

"Q. And she continued working for Jim Robbins Seat Belt Company after you came there, didn't she?

"A. Yes.

"Q. And you were paid, as you say you were working for Allied Chemical, you were paid by Allied Chemical on a salary basis?

"A. Yes, sir.

"Q. You never at any time told her that you were a salaried employee of Allied Chemical Corporation, did you?

"A. No.

"Q. And that continued right up until the end of this—or she died on July 3, 1973?

"A. Yes, sir.

"Q. Now Allied Chemical Corporation sort of had its engineers or research people in there doing the testing, such as testing on this Eaton chamber that exploded on July 3, 1973, did they not?

"A. Yes.

"Q. Now neither you nor anyone else under you ever told the Jim Robbins Seat Belt Company employees that it was Allied Chemical employees such as yourself and others that was testing this equipment, did you?

"A. No.

"Q. And certainly it is fair to say, would it not be, that as far as you know Brenda Sue Gaddis understood that she was working for Jim Robbins Seat Belt Company?

"A. Yes."

\* \* \* \* \* \*

Reduced to its essentials, Allied contends in its motion for a judgment notwithstanding the verdict that because Jim Robbins is a wholly owned subsidiary of Allied and because of the various economic and corporate factors enumerated above, Allied was an employer of Brenda Sue Gaddis, or the two economic and business entities are so integrated as to constitute a single unit. It is this single unit, Allied submits, whether denominated Allied Chemical Corporation or Jim Robbins Seat Belt Company, that is the employer within the meaning of Sections 903, 908 and 915 of Title 50 of the Tennessee Code Annotated. Allied thus assumes both the benefits and the accompanying responsibilities as the employer of Brenda Sue Gaddis on July 3, 1973. Allied argues that both the policy

and letter of Tennessee Workmen's Compensation Act, as articulated in Potts v. Knox-Tenn Rental, Inc., 62 Tenn.App. 699, 467 S.W.2d 796, support its position. Conversely, plaintiff insists that Allied is a third party to the employer-employee relationship and that Jim Robbins, not Allied, was the employer of Brenda Sue Gaddis.

■ Having carefully studied the record in this case, the legal arguments of counsel and independent examination of its own, the Court is of the considered opinion that, under the limited facts of this case, on July 3, 1973 Allied was not the employer of Brenda Sue Gaddis.

At the time of decedent's death on July 3, 1973, although a wholly owned subsidiary of Allied, Jim Robbins held its own charter, engaged in the production of seat belts in Knoxville, essentially dissimilar from the air bag operations of Allied, hired its own employees and paid them on its own payroll checks. Jim Robbins and Allied also maintained separate payroll withholding returns.

Brenda Sue Gaddis was originally hired by Jim Robbins on October 25, 1971 and continued to work on the seat belt activities of that company until sometime around April 1973 when she transferred to the air bag operations of Allied. During her entire period of employment with Jim Robbins, Brenda Sue Gaddis was an hourly employee of Jim Robbins and was paid on a Jim Robbins paycheck. She was never transferred to Allied's payroll, nor was she put on notice by any employee of Allied that she was in fact working for that manufacturing concern.

■ Although the stock ownership of one corporation by another may serve in certain instances as an indicia of identity or commixture as between the two, for the purpose of determining who may maintain a common law action against a third party, it is not conclusive.[5] Likewise, the presence of a common insurer as between the holding company and the wholly owned subsidiary does not automatically establish a single employer unit,[6] nor does identity of management create identity for workmen's compensation purposes.[7] Thus, while the spirit of the Workmen's Compensation Act of Tennessee may require that its provisions be interpreted liberally, such interpretation cannot be artifically strained beyond the realities of the labor market. Rather, whether Allied enjoyed sufficient identity with Jim Robbins on July 3, 1973 so as to raise the former to the legal status of an employer of Brenda Sue Gaddis can be answered only by determining if the two manufacturing concerns were so completely integrated and commingled that neither party could be realistically viewed as a separate economic entity. The Court cannot find such absolute integration in this case. An examination of the factors discussed above compel the Court to the observation that Jim Robbins by whom Brenda Sue Gaddis was employed was a sufficiently separate entity from Allied to permit a common law suit to be maintained against Allied. The fact that any loss suffered by either corporation would ultimately come out of the same common pocket is merely a fiscal attribute of common ownership, a trait which, as noted above, does not preclude the maintenance of a common law suit.[8] Thus, the fact that payroll checks for both companies may ultimately draw on the same account is

5. Thomas v. Hycon, Inc., 244 F.Supp. 151 (D.C.D.C.1965) (interpreting Maryland law) ; Gordon v. Hollywood-Beaufort Package Corp., 213 S.C. 438, 49 S.E.2d 718 (1948) ; Brown v. Moorhead Oil Co., 239 S. C. 604, 124 S.E.2d 47 (S.C.1962) ; Foley v. New York City Omnibus Corp., 112 N.Y.S.2d 217 (Sup.Ct.1952) ; Cf. Koscuik v. Sherf, 224 Wis. 217, 272 N.W. 8 (1937), Naranja Rock Co. v. Dawal Farms, 74 So.2d 282

(Fla.1954) ; Selid Construction Co. v. Guarantee Insur. Co., 355 P.2d 389 (Alaska 1960) ; But see contra Clostermann v. Gates Rubber Co., 394 F.2d 794 (9th Cir. 1968).

6. 244 F.Supp. at 154.

7. 213 S.C. at 443–444, 49 S.E.2d at 720.

8. See Note 5, supra.

not persuasive. Moreover, the listing of Brenda Sue Gaddis on Jim Robbins' payroll deduction returns but not those of Allied must be viewed as more than an administrative convenience on the part of Jim Robbins and Allied. It evidences the recognition by Allied of a degree of separation between the companies. Likewise, the realities of the collective bargaining agreement, which itself states the two parties to be Jim Robbins and the Textile Workers of America, and the Jim Robbins caption on its own paychecks cannot be ignored. In this regard the 322 Cas Avenue appearing below Jim Robbins Seat Belt Company on Exhibit 1 and the 353 Cas Avenue appearing below Automotive Products Division on Exhibit 2 further evidences a physical separation between the two entities.

In a similar, albeit alternative, vein, defendant Allied contends that if, as a matter of law, the Court views Allied and Jim Robbins as separate legal entitles, on July 3, 1973 Brenda Sue Gaddis was in the employ of Allied as a loaned employee of the general employer Jim Robbins. For the reasons set forth below, the Court feels that Allied's theory is misplaced.

In Winchester v. Seay, 219 Tenn. 321, 409 S.W.2d 378 (1966), the Tennessee Supreme Court adopted the guidelines set forth in Larson, Workmen's Compensation Vol. 1, § 48.00 at p. 710:

"LENT EMPLOYEES AND DUAL EMPLOYMENT.

"48.00 When a general employer lends an employee to a special employer, the special employer becomes liable for workmen's compensation only if

"(a) The employee has made a contract of hire, express or implied, with the special employer;

"(b) The work being done is essentially that of the special employer; and

"(c) The special employer has the right to control the details of the work.

"When all three of the above conditions are satisfied in relation to both employers, both employers are liable for workmen's compensation.

"Employment may also be 'dual', in the sense that, while the employee is under contract of hire with two different employers, his activities on behalf of each employer are separable and can be identified with one employer or the other. When this separate identification can clearly be made, the particular employer whose work was being done at the time of injury will be held exclusively liable."

This same section was again cited with approval by the Court in 1971 in Potts v. Knox-Tenn Rental, Inc., 62 Tenn.App. 699, 467 S.W.2d 796, 798 (1971). In both cases the Court found that the circumstances surrounding the claimant's employment at the time of his injury satisfied the provision of Section 48, *supra*. However, in both instances the Court was satisfied that the claimant met the threshold requirement of (a), that is, "[t]he employee ha[d] made a contract of hire, express or implied, with the special employer."

In light of the testimony of Mr. Sweet quoted above, the Court cannot make a comparable finding in this instance. While it can be credibly argued that the requirements of (b) and (c) are satisfied in this case, the proof fails to support the existence of a consensual relationship between Miss Gaddis and defendant. "While such a consent may be expressed or implied, there is nothing in the record upon which to predicate a finding of knowledgeable consent or a fair inference that an employment relationship between those parties existed." Blessing v. T. Shriver & Co., 94 N.J.Super. 426, 228 A.2d 711, 716 (1967). Brenda Sue Gaddis was hired by Jim Robbins on October 25, 1971 and continued to work on the seat belt activities of that company until sometime in April 1973 when she transferred to the air bags operations of Allied. She continued to receive a Jim Robbins paycheck

for her hourly work during this entire period. The Court cannot find the intermittent references to Allied on paychecks, buildings, insurance forms and trucks sufficient documentation by Allied upon which to establish Brenda Sue Gaddis' implied consent to work for Allied. Rather, the testimony of decedent's co-workers and supervisors points in an opposite direction. The record is without any evidence to show that decedent consented to a special or new employer when she was transferred to Allied's air bag operation, nor was she transferred to a new payroll.

 Because the employee's acceptance of a contract of hire is necessarily followed by his loss of right to maintain a common lawsuit against his special employer, such acceptance cannot be lightly inferred. It is clear, therefore, that an employee cannot consent to work for a special employer in the dark; "[f]or compensation purposes, [the employee] cannot have an employer thrust upon him against his will or *without his knowledge.*" Larson, § 48.10, at p. 211 (emphasis added). The testimony of Mr. Sweet indicates that Miss Gaddis was without such requisite knowledge, and the mere fact that Miss Gaddis' activities may have been controlled by the new master is not sufficient in itself to create a new relationship in the absence of an express or implied contract. Selid Construction Co. v. Guarantee Insur. Co., 355 P.2d 389 (Alaska 1960). *See generally,* Larson, § 48.10, pp. 205–211; Berrier v. Associated Indemnity Co., 142 Fla. 351, 196 So. 188 (1939). Thus, the tests in determining who is the employer is the same in workmen's compensation cases as in the master servant cases. City of Brunswick v. Taylor, 87 Ga.App. 751, 75 S.E.2d 203, 204 (1953); Thomas v. Hycon, Inc., 244 F.Supp. 151, 156 (D. C.D.C.1965).

 There, accordingly, appears to be substantial evidence in the record to support the jury's finding that Allied was not the employer of the decedent on July 3, 1973.[9] It should be noted that even if the question of whether the decedent was loaned is viewed in this instance as being one of law alone, it is clear that as a matter of law the decedent was not a special employee of Allied. Therefore, submitting the question to the jury was not prejudicial. Blessing v. T. Shriver Co., 94 N.J.Super. 426, 228 A.2d 711, 718 (Super.N.J.1967).

The Court next turns to defendant's motion for a new trial in which it argues that the Court's charge pursuant to International Harvester Co. v. Sartain, 32 Tenn.App. 425, 222 S.W.2d 854 (1948) was incorrect. In that case, the rule was set forth that:

"... [W]here the location and condition of the property and the nature of the work to be done are such that in the natural course of things mischievous consequences must be expected to arise, unless means are adopted by which such consequences may be prevented, then the owner is under the nondelegable duty to see that appropriate preventative measures are adopted." 32 Tenn.App. at 452, 222 S.W.2d at 866.

"... One who deals with an article which is imminently dangerous owes a public duty to all to whom it may come and who may be endangered thereby to exercise caution adequate to the peril involved, as for example, in giving notice of its dangerous character, and there need be no privity between him and the person injured." 32 Tenn.App. at 454–55, 222 S.W.2d at 867 (citing 45 C.J. 846, Section 264)

The Court also charged on the basis of simple negligence in addition to the *Sartain* charge. The Court believes that Allied is mistaken in the belief that the *Sartain* charge in this case was tantamount to imposing strict liability on Allied, that is, the type of liability imposed

---

**9.** Defendant's alternative theory of dual employment must similarly fail since that theory also assumes a contract of hire exists between the employee and his dual employers. Larson, §§ 48.00; 48.50.

in Section 48 of Prosser, Law of Torts, or its progeny Rylands v. Fletcher, L.R. 3 H.L. 330 (1868).

"As pointed out by Judge Anderson in the unreported opinion in L. Pacini v. Southwestern University (1–21–38), the rule of Bower v. Peate, [L.R. 1 Q. B.Div. 321, 35 L.T.N.S. 321] supra, is one requiring ordinary care under the circumstances, which may be a high degree of care actually, but is not a rule of absolute liability regardless of the exercise of ordinary care, so to make the owner an insurer as in Rylands v. Fletcher [L.R. 3 H.L. 330] (citation omitted), which has reference to situations where the owner brings upon his premises some substance, wild and vicious animal, or the like which may escape and injure person or property despite all precautions. There the owner keeps the thing at his peril and becomes an insurer." 32 Tenn.App. at 452–53, 222 S.W.2d at 866.

Since it is apparent that the liability imposed under the Court's charge is inapposite that of an insurer or strict liability, Allied's concept of commonality, discussed by Professor Prosser at page 512, Section 78, cannot serve as an accurate guideline. Judge Darr stated in Pierce v. United States, 142 F.Supp. 721 (E.D. Tenn.1955) that:

"As the doctrine of nondelegable duty is applied in this state it is not a rule of strict liability regardless of fault. Negligence is required, the sole effect of the doctrine being to preclude the owner-employer from escaping liability for negligence which was a proximate cause of injury on the ground that others may have been guilty of negligence, which was also a proximate cause of injury. As in any other case the basis of liability is negligence. This was made perfectly clear in the Sartain case, supra, where the Court pointed out that the rule 'is one requiring ordinary care under the circumstances, which may be a high degree of care actually, but is not a

rule of absolute liability regardless of the exercise of ordinary care.' " 142 F.Supp. at 734.

See also, Mahoney v. United States, 220 F.Supp. 823 (E.D.Tenn.1963).

Rather than looking to the definition of a dangerous *Rylands'* instrumentality, the appropriate definition is found in the *Sartain* decision itself "one . . . where the location and condition of the property and the nature of the work to be done are such that in the natural course of things mischievous consequences must be expected to arise, unless means are adopted by which such consequences may be prevented." The Court is of the opinion that it was an appropriate question for the jury to decide if this particular custom made Eaton pressure test chamber when pressurized to 3200 p. s. i. and placed in close proximity to other persons satisfied the requirements set forth above. In this regard the Court does not find the case of Graham v. Cloar, 30 Tenn.App. 306, 205 S.W.2d 764 (Tenn.App.1947), as controlling since the Court there went no further than to quote from Crigger v. Coca-Cola Bottling Co., 32 Tenn. 545, 552, 179 S.W. 155 (1916) that "[t]he liability of the Bottler is not that of a warrantor, or insurer, but rests on actual negligence in the discharge of a legal duty." Similarly, it is the opinion of this Court that the *Sartain* charge in this instance did not dispense with a necessary finding by the jury of negligence on the part of Allied.

Finally, Allied claims that the $300,000.00 verdict is excessive, evidences passion and caprice on the part of the jury and submits that the Court in adjusting the verdict is compelled to follow the case of Coppenger v. Babock Lumber & Land Co., 8 Tenn.App. 108 (1928). There the Court of Appeals, in reviewing a $15,000.00 jury verdict for the wrongful death of plaintiff's husband, held that plaintiff was entitled to recover no more than "a sum which will yield a wage covering [his life expectancy]." Allied submits that since the only

damage established by plaintiff was the decedent's loss of earnings, the actuarial discount of gross earnings establishes a ceiling, above which the jury cannot go. While the Court, having heard the proof in this case and the testimony of the economic expert, Dr. Moore, feels that the $300,000.00 verdict does not fall within the maximum bounds of reasonableness, it is not justified in reducing the verdict to $108,000.00; instead, it feels the jury's verdict should be remitted to $214,000.00, the amount of decedent's projected earnings.

Unless the remittitur is accepted by the plaintiff within ten days, a new trial is granted.