**Roy RUBLE and Pamela Ruble,
Appellants,**

v.

**ARCTIC GENERAL, INC., Appellee.**

**No. 3710.**

Supreme Court of Alaska.

Aug. 3, 1979.

---

**2.** *Des Jardins v. State,* 551 P.2d 181, 184 (Alaska 1976).

**3.** *Widmeyer v. Southeast Skyways, Inc.,* 584 P.2d 1, 9 (Alaska 1978).

Joseph W. Sheehan, Fairbanks, for appellants.

Dennis Bump, Hughes, Thorsness, Gantz, Powell & Brundin, Fairbanks, for appellee.

Before RABINOWITZ, C. J., CONNOR, BOOCHEVER and MATTHEWS, JJ., and DIMOND, Senior Justice.

## OPINION

PER CURIAM.

In June 1975, appellant Roy Ruble was working on the state funded Airport Road Extension Project in Fairbanks, Alaska. Ruble sustained injuries when the belly plate of a road scraper which he was operating became disengaged, causing the vehicle to come to an abrupt halt. He brought a tort action against Arctic General, Inc. (hereinafter "Arctic"), the owner-lessor of the road scraper; contending that Arctic was negligent in maintaining the machine. The superior court, acting on Arctic's and Ruble's cross-motions for summary judgment, dismissed Ruble's complaint, on the ground that he was an employee of Arctic and hence limited to his remedies under workers' compensation. AS 23.30.055. Ruble has appealed this dismissal. We affirm the judgment of the superior court.

On May 30, 1975, JIJ Nelson, Joint Venture (hereinafter "JIJ"), the contractor for the highway project, entered into an agreement with Arctic for the use of several pieces of road equipment. The agreement called for Arctic to maintain the equipment and supply operators. Accordingly, Ruble was dispatched from the union hiring hall to work for Arctic. He was put on Arctic's payroll and instructed in the use of the road scrapers by Bud LaFon, a part-owner of Arctic. Sometime in the next few days the state asked JIJ either to put Arctic's operators on its payroll or to make Arctic a subcontractor, in order to comply with state and federal law. JIJ and Arctic agreed on the former, and on June 2, Ruble was transferred to the JIJ payroll. His wages, however, were remitted by Arctic to JIJ after JIJ paid the equipment rental fees specified in the May 30 agreement. Ruble also continued to be accountable to and supervised by LaFon.

As a result of the accident, Ruble was dismissed from his job on June 16.[1] Three weeks later, he filed a workers' compensation claim against JIJ, and received benefits under that claim. In September, he began the action which is the subject of this appeal.

Both parties discuss at great length the various tests that we have used in the past to determine whether a person was an employee for workers' compensation purposes.[2]

---

1. The record does not show if he was formally dismissed by Arctic or by JIJ.

2. The doctrines discussed by the parties include the "nature of the work" test, adopted in *Searfus v. Northern Gas Co.*, 472 P.2d 966, 969–70 (Alaska 1970); the "contract of employment"

Those tests, however, were designed to differentiate employees from independent contractors, and have not proved useful here, where the question is whose employee Ruble was, rather than whether or not he was an employee at all.

In his text on workers' compensation law, Professor Larson discusses factors to be considered in determining the employer in situations involving joint employers and joint employment. According to Larson, a special employer[3] such as JIJ, becomes liable for workers' compensation only if the employee, here Ruble, has made a contract of hire, express or implied, with the special employer, the work being done is essentially that of the special employer, and the special employer has the right to control the details of the work.[4] In the usual case involving multiple employers, the employee is seeking to hold a particular employer liable for workers' compensation.[5] In such cases, the liberal purpose of the workers'

compensation act, to benefit the employee,[6] and the presumption that a claim comes within the provisions of the act[7] apply. In this case, however, an employee is seeking to hold the "general employer" liable as a third party. When an employee, who has coverage under the compensation act, seeks to hold his original employer liable as a third party, policy considerations are more evenly balanced. Thus, there are neither presumptions for or against finding tort liability on behalf of the third party, nor presumptions for or against finding an employment relation with respect to a particular employer.[8]

The issue before us quite simply, is whether the evidence presented indicates that the initially established employment relation between Arctic and Ruble had terminated at the time of Ruble's injury. Applying the Larson tests, it does not appear that Ruble entered into a contract of hire, express or implied, with JIJ.[9] The work

test, relied on in *Selid Constr. Co. v. Guarantee Ins. Co.*, 355 P.2d 389, 393 (Alaska 1960); and the "right of control" test, which we used in *Cordova Fish & Cold Storage Co. v. Estes*, 370 P.2d 180, 184 (Alaska 1962).

3. When one employer borrows an employee having an existing employment relation with another employer, the former is known as a "special employer," the latter as the "general employer." *See* 1B A. Larson, Workmen's Compensation Law § 48.10, at 8–208, 8–209 (1978) (hereinafter cited as Larson). In the case at bar, Arctic General is the general employer.

4. 1B Larson, *supra* note 3, § 48.00, at 8–205.

5. *See, e.g., Raymond Concrete Piling Co. v. Industrial Comm'n*, 37 Ill.2d 512, 229 N.E.2d 673 (1967); *Bradshaw v. Richardson Trucks, Inc.*, 467 S.W.2d 945 (Mo.1971).

6. *Hood v. State, Workmen's Comp. Bd.*, 574 P.2d 811, 813 (Alaska 1978); *S.L.W. v. Alaska Workmen's Comp. Bd.*, 490 P.2d 42, 43 (Alaska 1971).

7. AS 23.30.120(1).

8. With reference to a somewhat similar situation, Professor Larson states:

What gives the lent-employee cases their special character, however, is the fact that they begin, not with an unknown relation, but with an existing employment relation. The conflict of interest becomes one not be-

tween employer and employee (who is assured of recovering from someone) but between two employers and their insurance carriers. There is here no place for presumptions based on the beneficent purposes of the act. The only presumption is the continuance of the general employment, which is taken for granted as the beginning point of any lent-employee problem.

1B Larson, *supra* note 3, § 48.10, at 8–210 to 8–211 (footnote omitted).

9. We do not imply that the Workmen's Compensation Board erred in holding that JIJ was an employer under the Compensation Act. Because of the factors in workers' compensation law discussed above, JIJ could be considered such an employer. In *Cradic v. Eastman Kodak Co.*, 202 F.Supp. 590 (E.D.Tenn.1962), an excavation contractor leased a large piece of construction equipment, known as a "wobble-wheel," and an operator for the machine to Kodak. The operator sustained injuries while performing work under Kodak's control and supervision. The operator, who received a workers' compensation judgment against the excavation contractor, brought a common law negligence action against Kodak. The court dismissed the complaint, holding that the operator was an employee of Kodak, the "special employer," as well as the excavation contractor, the "general employer." In *Lewis v. S. M. Byers Motor Car Co.*, 102 Pa.Super. 434, 156 A. 899 (1931), a truck distributor furnished a truck with a driver to a gasoline delivery company.

was benefitting both Arctic and JIJ and was not essentially for JIJ any more than for Arctic, and all control was exercised by Arctic through LaFon, although JIJ had a right to designate the type and location of work to be performed by the scraper.

There is no dispute that Ruble was an Arctic employee until June 2, 1975. What effect, then, did his transfer to the JIJ payroll have? LaFon testified in his deposition that neither JIJ nor Arctic contemplated any significant change because of the payroll switch,[10] and no modifications were made to the written agreement. Arctic, by reimbursing JIJ, was, in reality, still paying Ruble's full salary after the transfer. Professor Larson states:

> The element of who pays the employee shrinks into comparative insignificance in lent-employee problems, because the net result is almost invariably that the special employer ultimately pays for the services received and the employee ultimately gets his wages. But whether the special employer pays the general employer who in turn pays the employee, which is the typical procedure in the Manpower-type cases, or whether the special employer pays the employee direct, the difference for present purposes is one of mechanics and not of substance. *Of course, if this is not so—that is, if either the general employer or the special employer pays the employee and is not reimbursed—the fact of payment is strong evidence that the payor is the employer.*[11]

According to Larson, the factor that seems to play the largest part in lent-employee cases is that of furnishing heavy equipment.[12] He cites many cases holding that a general employer furnishing operators and equipment continues to be regarded as the employer when the employee is injured.[13] Discussing the "right to control" factor, Larson states:

> [T]he majority of the decisions have been influenced by the arguments both that the general employer would naturally reserve the control necessary to ensure that his equipment is properly used, and that a substantial part of any such operator's duties would consist of the continuing duty of maintenance of the equipment.[14]

We believe that these factors are persuasive here. The lease between Arctic and JIJ involved six pieces of heavy earth-moving equipment which Arctic agreed to operate and maintain. Arctic also retained the authority to see that its equipment was properly used and not abused.[15]

Further, several JIJ officials stated in affidavits that they never considered Ruble to be a JIJ employee, and Ruble himself in his deposition expressed unequivocally that he believed himself an Arctic employee.[16] He received all of his orders from LaFon and reported his injury to him. Given these facts, we cannot find that Ruble's status as an employee of Arctic ended on June 2.

Ruble relies heavily on the determination of the Alaska Workmen's Compensa-

---

The driver was killed when an explosion occurred during the delivery of gasoline. The driver's wife sought workers' compensation against both companies, and the court held that the truck distributor, alone, was the employer. *Id.* 156 A. at 901. In a later suit arising out of the same facts, a widow of a third party killed by the explosion sought to recover damages from both the truck distributor and the gasoline company based on the deceased driver's negligence. The Supreme Court of Pennsylvania held that both companies were vicariously liable, giving no weight to the compensation decision. *Gordon v. S. M. Byers Motor Car Co.*, 309 Pa. 453, 164 A. 334, 336 (1932).

10. He referred to it as "a token thing."

11. 1B Larson, *supra* note 3, § 48.30, at 8–248 to 8–250 (emphasis added, footnotes omitted).

12. *Id.* at 8–250.

13. *Id.* at 8–250 to 8–251.

14. *Id.* at 8–253.

15. Bud LaFon testified in his deposition:
    Well, I did have control over [Ruble] on the way he handled the machine. If I felt that he was abusing the machine, or dangerous, I would have control.

16. Under questioning by his own attorney, Ruble backed off somewhat from that flat assertion.

tion Board that he was a JIJ employee, and on Arctic's failure to participate in those proceedings. The Board's determination, however, cannot be binding on Arctic, as Arctic was not a party to those proceedings.[17] Since Ruble filed his worker's compensation claim against JIJ, we will not attribute any weight to Arctic's unwillingness to intervene.[18] Finally, while we do not condone Arctic's failure to comply with its statutory duty to file a report with the Workmen's Compensation Board within ten days after learning of an employee's injury,[19] we do not believe this fact is of significance in the determination of whether there was an employment relationship between Arctic and Ruble.

The trial court found that Ruble was an employee of both Arctic and JIJ. Larson writes:

> Joint employment occurs when a single employee, under contract with two employers, and under the simultaneous control of both, simultaneously performs services for both employers, and when the service for each employer is the same as, or is closely related to, that for the other. In such a case, both employers are liable for workmen's compensation.[20]

Because this appeal involves the limited issue of Arctic's relationship to Ruble, we do not reach the question of whether Ruble was also an employee of JIJ or a joint employee.

Ruble's arguments emphasize form over substance. Even though his check was issued by JIJ, the money came from Arctic, and his employment was in every way more closely linked to Arctic then to JIJ. The judgment of the superior court dismissing the action is AFFIRMED.

BURKE, J., not participating.

---

17. We note that the Board's determination is not necessarily inconsistent with Arctic's position: the Board may have concluded that Ruble was a joint employee, or JIJ may have decided not to raise its possible non-employer defense.

18. While the record indicates that Arctic had notice of Ruble's injury shortly after it occurred, nothing in the record indicates that Arctic was aware of the workers' compensation proceeding against JIJ.

19. AS 23.30.070(a).

20. 1B Larson, *supra* note 3, § 48.40, at 8–253.