Loren W. **CROXTON**, Personal Representative of the Estate of Ruth E. Croxton, Appellant,

v.

**CROWLEY MARITIME CORPORATION**, a Delaware corporation, Appellee.

No. S–3512.

Supreme Court of Alaska.

Aug. 30, 1991.

James D. Rhodes, Michael D. White, Hartig, White, Rhodes, Norman, Mahoney & Edwards, Anchorage, for appellant.

David T. Hunter, Michael K. Nave, Lane Powell & Barker, Anchorage, for appellee.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

BURKE, Justice.

This is an appeal from a decision of the superior court after a bench trial. The Estate of Ruth Croxton (the Estate) sought to hold Crowley Maritime Corporation (Crowley), the parent company of Croxton's employer, vicariously liable for the alleged negligence of Tim Morrison, which it claimed was a cause of the work-related plane accident that took Croxton's life. The court agreed with the Estate that Morrison was negligent and that the negligence was a proximate cause of Croxton's death. The court also found, however, that Morrison was not an employee of Crowley Maritime, but rather of the Crowley subsidiary that employed Croxton. Because the Workers' Compensation Act provides the exclusive remedy for injuries caused by a fellow employee, the Estate's complaint was dismissed. The Estate appeals. We reverse.

### I

Ruth Croxton died in 1981 when the Beechcraft she was co-piloting as an employee of Puget Sound Tug and Barge Co. (PST & B) crashed into a hillside at King Cove. The personal representative of Croxton's estate sued PST & B and its parent corporation, Crowley, for wrongful death. After a long series of preliminary proceedings, including one appearance before this court, *Croxton v. Crowley Maritime Corp.*, 758 P.2d 97 (Alaska 1988) (*Croxton I*), the Estate's case finally came to a bench trial in 1989 with Crowley as the remaining defendant.

The Estate predicated Crowley's liability on the assertion that Crowley's employee, Tim Morrison, the chief pilot of the aviation department, was negligent in assigning Ernest Fife as pilot-in-command of the ill-fated flight without properly training him first. Although an experienced pilot, Fife had only recently come with the company, had flown very little during the preceding couple of years, and was unfamiliar with the potentially hazardous approach to the

King Cove airstrip. One of Morrison's pilots, who conducted a training flight with Fife shortly before the accident, told Morrison that Fife was still rusty as a result of his long layoff from flying. Fife received minimal training from Crowley before being assigned as pilot-in-command of the fatal trip.

After hearing all the evidence, the superior court concluded that Morrison was negligent in assigning Fife to the flight and that his negligence was a proximate cause of Croxton's death. It also concluded that the weight of the evidence indicated that Fife was flying the plane at the time of the crash and that Croxton was not contributorily negligent. It calculated damages to be $319,066.

The court went on, however, and held that Morrison was an employee of PST & B, rather than Crowley, and thus Croxton's co-employee:

> Everything that Morrison did related to flight operations for Puget Sound Tug & Barge. He was the chief pilot. And as chief pilot, his duties included making sure that all the pilots below him were properly trained, and in conducting—and in the overall overseeing of flight operations, deciding who to dispatch when and where. He did that. Overseeing maintenance operations, overseeing mechanical repairs. He was in charge of the flight operations. He was the chief pilot. And then he reported, as I've already indicated, to O'Shea and Puget Sound Tug & Barge.
>
> He, Morrison, received his paycheck from Crowley Maritime Corporation. And that's really the only indication that there is that he was Crowley Maritime Corporation's employee was the mere fact that he got his paycheck from there. In every other respect, what he did, particularly with respect to Mr. Fyfe [sic] and Miss Croxton, was in performance of his function as chief pilot for Puget Sound Tug & Barge. The negligence

that he committed here was committed in the performance of his duties for Puget Sound Tug & Barge, irrespective of the fact that his paycheck for that month, and for the month before that and for the month after it before he was terminated, came from Crowley Maritime Corporation.

Croxton's suit was consequently barred by the exclusive remedies provision of the Alaska Workers' Compensation Act. AS 23.30.055.[1] Judgment was entered in favor of Crowley. The Estate appeals solely on the question of whether the superior court was correct in finding Morrison and Croxton to be co-employees.

## II

The superior court concluded that Tim Morrison was the employee of PST & B rather than of Crowley. In so ruling the court disregarded the corporate form of Morrison's employment and based its decision on what it perceived to be the actual substance of his employment.

### A

Before exploring the applicable law, it is necessary to understand Crowley's corporate structure. Crowley Maritime Corporation, though closely held, is a large organization whose business is carried out by numerous subsidiaries, which in turn often operate through their own subsidiaries. PST & B is one of Crowley's primary subsidiaries and is wholly owned by it. Crowley is a Delaware corporation with its headquarters in San Francisco. PST & B is a Washington corporation with its headquarters in Seattle. The two corporations are registered separately in Alaska.

Legally, then, Crowley and PST & B have separate identities, which are respected under Alaska law. *Elliot v. Brown*, 569 P.2d 1323, 1326 (Alaska 1977). As often happens in the parent-subsidiary context,

---

1. AS 23.30.055 provides:
   The liability of an employer prescribed in AS 23.30.045 is exclusive and in place of all other liability of the employer and any fellow employee to the employee, the employee's legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from the employer or fellow employee at law or in admiralty on account of the injury or death.

the legally clear line between one company and another becomes blurred in practice. In this case, one source of such blurring comes from the fact that all "salaried, full-time, permanent, nonunion" employees are carried on Crowley's payroll. This arrangement was apparently motivated by various business considerations, including tax and labor relations concerns.[2]

This status, for example, applied to William O'Shea, Morrison's direct supervisor. Although O'Shea was apparently in charge of PST & B, he, like Morrison, received a paycheck that clearly identified his employer as Crowley Maritime Corporation.[3] Matters are further complicated by the tendency of Crowley personnel to refer to PST & B and its various subsidiaries as the Northwest and Alaska Division of Crowley. Thus, O'Shea attested in a sworn affidavit that his official title was "Vice President Arctic, Operations, Northwest & Alaska Division, Crowley Maritime Corporation." At his deposition O'Shea first stated that he was employed "[b]y Crowley." When asked whether he was employed by Crowley or a subsidiary, he replied:

> I work for, as my card says, Northwest and Alaska Division. That has been rearranged currently at this time what they call the Pacific Division, which was a reorganization that took place this year, but I work for Puget Sound Tug & Barge, APUTCO, various subsidiaries or operations of Crowley out of the Seattle area.[4]

Crowley's brief refers to him as "Vice President of Arctic Operations for PST & B."[5] By contrast, Crowley seems to consider O'Shea's supervisor, Roy Jergenson—who was the senior vice president and general manager of the Northwest and Alaska Division—to be a Crowley employee.

The role of the aviation department that Morrison headed was to service the aviation needs of the Northwest and Alaska Division—that is, PST & B and its various subsidiaries. The aviation department was considered a cost center, meaning that it generated no revenue through its operations; the costs of its activities were charged to whatever subsidiary made use of it. Morrison and all the permanent pilots were carried on Crowley's payroll. Seasonal pilots, including Croxton and Fife, were carried on the PST & B payroll. At least one pilot was originally hired by Morrison as a seasonal employee and received PST & B paychecks, then transferred to the Crowley payroll when he was given permanent status. Crowley emphasizes in

2. In its decision the superior court focused on the labor relations reasons: "[A] little cheat on the unions is what it looks like.... It would appear that Crowley was—unless it had the permission of the unions, that Crowley was doing a little administrative sl[e]ight of hand to keep its subsidiary corporations' employees from being subjected to the demands of unions." The Estate now highlights this finding of an anti-union motive behind Crowley's corporate structure (without incidentally alluding to supportive evidence in the record). In response, Crowley points to evidence in the record suggesting that the use of subsidiaries was at the request of its unions. The underlying point, however, is the same: The uncontested fact is that the payroll structure provided business benefits to Crowley.

3. Morrison and O'Shea's paystubs said at the top, in small capital letters: "Your employer during the period was 001 Crowley Maritime Corp." Croxton's said: "Your employer during the period was 043 Puget Sound Tug & Barge Co."

4. O'Shea did not testify at trial, but his deposition was entered as evidence.

5. At trial Crowley presented the woman who was personnel manager for the Northwest and Alaska Division at the time of the crash. This exchange took place during her testimony:

> THE COURT: Who was O'Shea employed by?
> WITNESS: Mr. O'Shea was employed by—under the Northwest and Alaska Division, he was the VP of Arctic Operations.

She then noted that his Personnel Action Notices were coded "[o]h-[o]h-one, Crowley Maritime."

The witness was similarly unclear about her own employment status. She identified herself as having been personnel manager of the Northwest and Alaska Division at the time of the crash. When asked to explain what she meant by Northwest and Alaska Division, she said it "is organized under Puget Sound Tug and Barge Company with the various companies, corporations, joint ventures, under Puget Sound Tug and Barge Company." Then, on cross-examination, she twice answered affirmative when directly asked if she was employed by Crowley Maritime Corporation at the time of the accident.

its brief that the change in status did not involve any change in duties or job description.

The Flight Training Certification for Ernest Fife had the Crowley logo at its top, below which was the heading "CROWLEY MARITIME CORPORATION, AVIATION DIVISION." [6] The certification is signed by Tim Morrison. At the very bottom, printed in small capital letters, are the words "Northwest and Alaska Division." The form has no reference to PST & B. Similarly, the "Daily Flight Record" for the crashed plane has the Crowley logo on it, but no indication that the plane was legally owned by PST & B, as it apparently was.

### B

Although the superior court held in favor of Croxton's estate on issues of liability and damages, it concluded its decision by observing that Tim Morrison's employment status was "the critical question for the decision of this case." It held

> that the carrying of people like Morrison and O'Shea on the direct payroll of Crowley Maritime Corporation does not mean that they are employees of Crowley Maritime; that that indeed was done for administrative purposes, and it appears in this case, from the record in this case, that it was done for the purpose of avoiding unionization. ...
>
> . . . .
>
> ... Mr. Morrison was acting as an employee in the course and scope of his employment for Puget Sound Tug & Barge when he made these fatal errors in overseeing the training of Fyfe [sic] and in dispatching him on the fateful day.

As Crowley notes in urging affirmance, the court's holding can be characterized as a "functional analysis of 'employee' status."

In arriving at this conclusion, the court found persuasive a similar conclusion made by the Washington Department of Revenue in an administrative context. In that proceeding, Crowley appealed a state tax deficiency that had been levied against it for employees on its payroll whom it claimed were actually PST & B employees. As in this case, Crowley urged a functional analysis, claiming there that the payroll structure was purely a matter of accounting convenience. The administrative law judge apparently agreed, concluding that "the payrolling system or program adopted by [Crowley] ... is a form over substance cost accounting technique only. The handling of payroll through a centralized, computerized program for all subsidiary companies is not dispositive that the employees paid through this system are the employees of the person who does the payrolling."

### III

Crowley does not deny that Morrison was formally employed by Crowley while Croxton was formally employed by PST & B. Its argument has consistently been that Alaska law requires that employment status be determined by substance rather than form, (citing *Ruble v. Arctic General, Inc.*, 598 P.2d 95 (Alaska 1979)). While employment status is a matter of fact in Alaska's workers' compensation law, the operative question in this case is what legal effect the fact of a particular corporate form has as against the corporation that voluntarily chooses that form. The superior court erred as a matter of law in allowing Crowley to argue the substance of Morrison's employment status in derogation of its form. This error stems from overlooking the "general rule" that "persons who choose to become incorporated may not evade the consequences of corporateness when that would suit their convenience." H. Henn & J. Alexander, *Laws of Corporations* § 149, at 357 (3d ed. 1983).

Typically, a party outside the corporation seeks to disregard the corporate form in order to widen the net of liability. *E.g.*,

---

**6.** During Morrison's deposition, Crowley's counsel asked Croxton's counsel to use the term "aviation operations" rather than "aviation division," because "the Northwest and Alaska division of Crowley is Puget Sound Tug and Barge and its subsidiaries, and the aviation operations supported all of those various operations up there, and there is no separate corporate entity or structure called the aviation division within Crowley Maritime Corporation."

*Jackson v. General Electric Co.*, 514 P.2d 1170 (Alaska 1973) (plaintiff sought unsuccessfully to disregard formal separateness of General Electric and a wholly-owned subsidiary). In the workers' compensation context, however, the situation is often reversed: The corporation itself argues that the form should be disregarded. The corporation's argument may be that a parent and a subsidiary are substantively one entity in spite of the corporate form. *E.g., Boggs v. Blue Diamond Coal Co.*, 590 F.2d 655 (6th Cir.), *cert. denied,* 444 U.S. 836, 100 S.Ct. 71, 62 L.Ed.2d 47 (1979). Or the corporation may argue that a worker ostensibly employed by a subsidiary is actually employed by the parent. *E.g., Latham v. Technar, Inc.*, 390 F.Supp. 1031 (E.D.Tenn. 1974). The circumstances of this case are somewhat unique in that Crowley argues that a worker ostensibly employed by the parent is actually employed by the subsidiary.[7] That variation notwithstanding, the underlying premise of Crowley's argument is that the court should, in essence, "pierce" the Crowley corporate veil and look beyond the formalities of Morrison's employment status.[8]

We have adopted the general rule that "the veil may be pierced only if the corporate form is used 'to defeat public convenience, justify wrong, commit fraud, or defend crime.'" *Elliot v. Brown*, 569 P.2d 1323, 1326 (Alaska 1977) (quoting *Jackson*, 514 P.2d at 1172–73).[9] Common sense dictates that this rule should preclude Crowley's argument that "functional analysis" of Morrison's employment is more appropriate than respect for Crowley's corporate form. Indeed, numerous courts have rejected similar arguments in analogous situations.

In *Boggs*, the widows of miners killed in a mine explosion brought a wrongful death action against the decedents' employer's parent company, Blue Diamond, alleging negligence on its part separate from conduct of the subsidiary. *Boggs*, 590 F.2d at 657. Blue Diamond claimed immunity from tort under Kentucky's Workmen's Compensation Act on the theory that parent and subsidiary operated an "integrated business," and thus were a joint or single employer. *Id.* at 658. As does Crowley in this case, Blue Diamond stressed the importance of substance over form:

> All coal produced by Scotia is sold by Blue Diamond and shipped as directed by Blue Diamond. Sales are invoiced to customers by Blue Diamond and deposited in its bank accounts. A sale of coal from Scotia is entered as a credit to Scotia on the accounting records, but all money is retained by Blue Diamond and used as it chooses. Funds needed to pay expenses at Scotia are furnished by Blue Diamond with an appropriate entry in the intercompany accounts.

*Id.* at 657 (quoting Blue Diamond's brief).

■ The court rejected Blue Diamond's argument, reasoning that respect for corporate separateness applies as much when the corporation seeks to disavow it as when a plaintiff seeks to "pierce" the veil:

> [A] business enterprise has a range of choice in controlling its corporate structure. But reciprocal obligations arise as a result of the choice it makes. The owners may take advantage of the benefits of dividing the business into separate corporate parts, but principles of reciprocity require that courts also recognize the separate identities of the enterprises when sued by an injured employee.

---

7. Crowley does briefly argue in the alternative that if Morrison is considered a Crowley employee, then Croxton should be as well.

8. Crowley's argument that it is not attempting to pierce its own corporate veil because it does not deny the existence of any entity takes too narrow a view of the doctrine. The issue is whether Crowley is trying to "avoid the consequences of its own corporate structure." *Boggs*, 590 F.2d at 662.

9. We have also noted that corporate form may be disregarded where a subsidiary is a "mere instrumentality" of its parent. *Jackson*, 514 P.2d at 1173; *see also McKibben v. Mohawk Oil Co.*, 667 P.2d 1223, 1229 (Alaska 1983). Crowley does not contend that PST & B was a "mere instrumentality." We have never suggested that either of these theories is available to the corporation to pierce its own corporate form. *See McKibben*, 667 P.2d at 1229–30 (discussing circumstances under which parent corporation may be held liable in spite of corporate form).

*Id.* at 662. This reasoning applies with equal vigor to a company's decision to designate an individual as the employee of one entity rather than another. For whatever benefit it derives from that choice, it incurs reciprocal obligations.

A situation somewhat closer to the present case occurred in *O'Brien v. Grumman Corp.*, 475 F.Supp. 284 (S.D.N.Y.1979). A test pilot employed by Grumman American Aerospace Corporation was killed in the crash of a Grumman Gulfstream II. His widow and estate brought suit against Grumman American's parent—Grumman Corporation—and a sibling company—Grumman Aerospace Corporation for wrongful death and survival damages based on negligence, strict liability, and breach of warranty. *Id.* at 287. In an argument that resembles Crowley's "functional analysis," the defendants asserted an exclusive remedy defense on the ground that the pilot, whose widow had received workers' compensation benefits from Grumman American, " 'should be regarded as being employed by the Gulfstream II program as an entity whose components, Grumman [Corp.], Grumman Aerospace and Grumman American, all stand on equal footing as his "Employer." ' " *Id.* at 291 (quoting Defendants' Memorandum of Law in Support of Summary Judgment).

The court rejected this argument: "[T]he fact remains that Mr. O'Brien was employed and paid by Grumman American and not by Grumman Corp. or Grumman Aerospace or some other nebulous 'economic entity.' As an employee of Grumman American, it must be presumed that Mr. O'Brien was controlled by that entity and none other." *Id.* at 292 (citation omitted). The court suggested that that presumption would only be overlooked in the context of allegations that Grumman American was "a mere agent or instrumentality of Grumman Corp. or Grumman Aerospace." *Id.*

Crowley has an inherently stronger position than Grumman in that it refuses to acknowledge that Morrison was ever a Crowley employee. Although Crowley did not specifically distinguish this case or any other in its brief, presumably its argument would be that no presumption concerning Morrison's employment status can arise before some test is used to determine his status in the first place. The proper test, Crowley would say, is a common-sense, functional analysis using the indicia discussed in *Ruble v. Arctic General, Inc.*, 598 P.2d 95 (Alaska 1979), where "this Court refused to 'emphasize form over substance.' " Appellee's Brief at 19 (quoting *Ruble*, 598 P.2d at 99). The entire point of the corporate veil doctrine, however, is that form *does* prevail over substance, except in those limited circumstances involving fraud or injustice. Thus, the applicable rule for an employer in Crowley's position is that an employee is presumed to be controlled by his formal employer and none other, at least as far as related corporate entities are concerned. *See Boggs*, 590 F.2d at 662.

This rule does not contradict *Ruble*, which involved two unrelated corporations in a "lent employee" context.[10] *Id.* at 97. It is, moreover, consistent with this court's previous decisions placing corporate form over substance. *Elliot*, 569 P.2d at 1326; *see also State, Dep't of Revenue v. Alaska Pulp America, Inc.*, 674 P.2d 268, 275 (Alaska 1983) ("Generally, courts refuse to look through the corporate veil and consider separate corporations a single unit even when inter-corporation transactions are mere bookkeeping entries."). And it accords with the large number of courts that have refused to allow corporations to disavow their corporate forms in workers' compensation contexts, very often citing the reciprocity rationale presented in *Boggs*. *E.g., Gregory v. Garrett Corp.*, 578

---

**10.** A lent employee situation occurs "[w]hen one employer borrows an employee having an existing employment relation with another employer." *Id.* at 97 n. 3. Crowley's argument that Morrison was always a PST & B employee precludes any direct application of a "lent employee" analysis.

We have suggested elsewhere that *Ruble* supplies the test for multiple employer cases in general. *Kroll v. Reeser*, 655 P.2d 753, 756 (Alaska 1982). Like *Ruble*, however, *Kroll* concerned which of two *unrelated* employers had an employment relationship with the injured worker.

F.Supp. 871, 886 (S.D.N.Y.1983) (attempt to disregard own corporate form is "a legal theory that has not met with a warm reception in the courts of most states").[11]

■ Crowley quite legitimately chose to put Morrison on the Crowley payroll and chose to put Croxton and Fife on the PST & B payroll. It chose to establish aviation operations to support a large number of incorporated entities without making the aviation activity either a part of any one of those entities or a separate legal entity itself. In staffing these aviation operations it apparently used "employees" of two different corporations. Crowley's own witness conceded that this form of organization served various business interests of Crowley. Because Crowley attained advantage from operating in this manner rather than some other, simple fairness and the weight of analogous precedent require it to accept the incidental disadvantage of liability for its employee's negligence.

Given that Morrison must be considered a Crowley employee and Croxton a PST & B employee, the exclusive remedy provision of the Workers' Compensation Act is inapplicable. There seems no doubt that Morrison was acting within the scope of his employment in assigning Fife to command the flight, an act which the superior court has already determined was negligent and a proximate cause of Ruth Croxton's death. Thus, no further barrier exists to entering judgment against Crowley, based on its vicarious liability for Morrison's acts, for the amount of damages already determined by the superior court.

---

**11.** . *See also Smith v. Atlantic Richfield Co.,* 814 F.2d 1481, 1488 (10th Cir.1987) (court "disapprove[s] any attempt" to avoid consequences of corporate structure); *Love v. Flour Mills of America,* 647 F.2d 1058 (10th Cir.1981); *Boggs,* 590 F.2d at 655; *Lane v. Kingsport Armature & Electric,* 676 F.Supp. 108 (D.Va.1988); *Porter v. Beloit Corp.,* 667 F.Supp. 367, 369 (S.D.Miss. 1987) (subsidiary not entitled to immunity of parent); *Peterson v. Trailways, Inc.,* 555 F.Supp. 827 (D.Colo.1983); *Stoddard v. Ling–Temco–Vought, Inc.,* 513 F.Supp. 314, 325–27 & nn. 3–4 (C.D.Cal.1980) (citing "vast weight of authority"), *remanded on different issue,* 711 F.2d 1431 (9th Cir.1983); *Choate v. Landis Tool Co.,* 486 F.Supp.774 (E.D.Mich.1980) (placing corporate form over defendant's assertion of "economic

reality"); *O'Brien,* 475 F.Supp. at 284; *McDaniel v. Johns–Manville Sales Corp.,* 487 F.Supp. 714, 716 (N.D.Ill.1978) ("[d]efendants have uniformly been denied the opportunity to pierce their own corporate veil in order to avoid liability"); *Latham v. Technar, Inc.,* 390 F.Supp. 1031 (E.D.Tenn.1974); *Thomas v. Hycon, Inc.,* 244 F.Supp. 151 (D.D.C.1965); *Gulfstream Land & Development Corp. v. Wilkerson,* 420 So.2d 587 (Fla.1982); *Lyon v. Barrett,* 89 N.J. 294, 445 A.2d 1153 (1982); *Stratman v. Admiral Beverage Corp.,* 760 P.2d 974, 984 (Wyo.1988) ("[W]e will continue to adhere to the majority rule, that, on issues of immunity, the separate corporate identity of affiliated corporations will not be disturbed.").

---

The decision of the superior court dismissing the Estate is REVERSED and this case REMANDED for entry of judgment against Crowley.