ROBERT ANTONINI, APPELLANT, *v.* HANNA INDUS-
TRIES, A FOREIGN CORPORATION, RESPONDENT.

No. 9185

January 25, 1978                                    573 P.2d 1184

*Pat J. Fitzgibbons,* of Las Vegas, for Appellant.

*Lorin D. Parraguirre,* of Las Vegas, for Respondent.

[3]The Chief Justice designated HON. DAVID ZENOFF, Chief Justice (Retired), to sit in this case, Nev. Const. art 6, § 19; SCR 244.

## OPINION

*Per Curiam:*

Robert Antonini has appealed from an order of the district court dismissing his action in tort against Hanna Industries. The district court found that Hanna, as Antonini's employer, was statutorily immune from tort liability under the provisions of the Nevada Industrial Insurance Act (NIIA). NRS 616.010 *et seq.* We affirm that decision.

Antonini was injured on September 13, 1974, when a steel arch comprising part of a carwash display that he was attempting to dismantle collapsed beneath him. This display was owned by Hanna Industries, a Texas corporation, and had been exhibited by Hanna at the Las Vegas Convention Center.

Antonini was hired out of Teamsters Local No. 631 on September 12, 1974, by Las Vegas Convention Services, Inc. (LVCS). The normal business practice of LVCS was to contract with convention exhibitors for the assembly and dismantling of exhibits at the Convention Center.

Antonini had worked for LVCS on a number of previous occasions. In the vast majority of his past jobs with LVCS, his activities at the Convention Center had been supervised and directed exclusively by LVCS personnel, the exhibitor merely retaining control over the end result of the work. However in this instance, due apparently to the complexity of the carwash apparatus, the exhibitor Hanna Industries insisted upon the retention of complete control over the dismantling operation. While dismantling the display under the direction of "Les", an employee of Hanna, Antonini was injured.

Antonini sought and recovered an award from the Nevada Industrial Commission (NIC) under the policy of LVCS. He then brought this tort action against Hanna, alleging its liability under two alternative theories.[1] First, he argues that Hanna is liable as a third-party tort-feasor under NRS 616.560.[2] Alternatively, he argues that even if an employment relationship arose between Hanna and himself, Hanna should nonetheless be found liable in tort as an uninsured employer under NRS 616.375.[3]

I. *Was Hanna Industries Antonini's employer within the meaning of the NIIA?*

NRS 616.090 defines "employer" for the purposes of Nevada's workmen's compensation act to include "[e]very person, firm, and private corporation . . . which has any natural person in service." In the interpretation of this provision, this court has not deemed itself bound by common law tests of employment derived from the particular policies underlying the doctrine of vicarious liability. Heidtman v. Nevada Ind. Comm'n, 78 Nev. 25, 368 P.2d 763 (1962). Rather, in keeping with the particular purposes of the Nevada Industrial Insurance Act (NIIA), we have adopted a policy of broad and liberal interpretation, Nevada Ind. Comm'n v. Bibb, 78 Nev. 377, 374

---

[1] NRS 616.370 provides, in pertinent part, that "[t]he rights and remedies provided in [Ch. 616, NRS] for an employee . . . shall be exclusive . . . of all other rights and remedies of the employee . . . at common law or otherwise. . . ." Antonini is therefore confined to the provisions of Ch. 616. *See* Tab Constr. Co. v. District Court, 83 Nev. 364, 432 P.2d 90 (1967).

[2] NRS 616.560 provides, in pertinent part, that an "employee coming under the provisions of [the NIIA who] receives an injury for which compensation is payable under [Ch. 616, NRS] which injury was caused under circumstances creating a legal liability in some person *other than the employer* or a person in the same employ," may proceed against such third party in tort. (Emphasis supplied.)

[3] NRS 616.375 provides, in pertinent part, that "any employer within the provisions of [Ch. 616 who] fails to provide and secure compensation" to an injured employee shall be liable in tort to such employee. In such an action, the non-participating employer is deprived of all common law defenses, and may only escape liability upon proof that he was completely non-negligent.

P.2d 531 (1962), recognizing that the NIIA should operate not only for the benefit of injured workers, Industrial Commission v. Peck, 69 Nev. 1, 239 P.2d 244 (1952), but also for the protection of employers against common law tort actions. Simon Service v. Mitchell, 73 Nev. 9, 307 P.2d 110 (1957). *See* Jackson v. Southern Pacific Company, 285 F.Supp. 388 (D. Nev. 1968). These dual concerns are in accord with the interpretive policies of the majority of other U.S. courts. *See* 1A Larson, *Workmen's Compensation Law,* §§ 43–44 (1973).

In characterizing the relationship between an owner-contractee and a worker engaged in a particular project with respect to that owner's property, we have placed primary emphasis upon the amount of "control" exercised by the contractee over the worker.[4] Under the general term "control", several factors have been accorded substantially equal weight in determining the existence of an employment relationship. These include the degree of supervision exercised over the details of the work, the source of the worker's wages, the existence of a right to hire and fire the worker, and the extent to which the worker's activities further the general business concerns of the alleged employer.[5] Titanium Metals v. District Court, *supra;* McDowell Constr. Supply Co. v. Williams, 90 Nev. 75, 518 P.2d 604 (1974); Nevada Ind. Comm'n v. Bibb, *supra.*

Under this flexible approach, we have held that an owner-contractee who exercised significant operational control over the details of the construction work for which he had contracted assumed employer status for the purposes of NRS 616.560. Simon Service v. Mitchell, *supra;* Titanium Metals v. District Court, *supra;* Frith v. Harrah's South Shore Corporation, *supra.* Conversely, in Nevada Ind. Comm'n v. Bibb, *supra,* we found a newsboy to be an employee rather than an independent contractor, although the newspaper had *not*

---

[4]Thus, we have held that an inactive owner of property does not become an "employer" under the NIIA merely through his status as a contractee for services to his property. Frith v. Harrah's South Shore Corp., 92 Nev. 447, 552 P.2d 337 (1976). Simon Service v. Mitchell, *supra;* Titanium Metals v. District Court, 76 Nev. 72, 349 P.2d 444 (1960). Therefore, in what apparently was LVCS's normal contract procedure, in which an exhibitor merely engaged LVCS to erect and disassemble an exhibit under the direction of LVCS personnel, the *inactive* exhibitor did not become, by reason of its status as an owner-contractee, an "employer" subject to the NIIA.

[5]The rejection of a test focusing exclusively upon the degree of control over operational details has been echoed in a substantial number of other U.S. jurisdictions. See Danek v. Meldrum Mfg. and Engineering Co., Inc., 252 N.W.2d 255 (Minn. 1977); Schwartz v. Riekes and Sons, 240 N.W.2d 581 (Neb. 1976); Wright v. Habco, Inc., 419 S.W.2d 34 (Mo. 1967).

assumed a direct supervisory role over his activities. We relied nonetheless upon the retained right to control the hours and the location of employment, the right to specify the prices at which the newspapers could be sold, and the right summarily to terminate the newsboy's services to find that an employment relationship had arisen for the purpose of providing compensation under the Act.

On the other hand, in McDowell Construction Supply Co. v. Williams, *supra,* we held that a seller's delivery man did not become a "loaned employee" of the buyer merely by unloading the purchased material at the direction of the buyer at specified locations throughout a construction site. We found that the amount of operational control and supervision exercised by the buyer was insufficient to establish an employment relationship when balanced against the absence of the right to hire and fire, the right to control the details of the worker's forklift operations, the deliveryman's continued payment by the seller, and the fact that the delivery was primarily in furtherance of the course of business of the seller.[6]

The record reveals that the arrangement between LVCS and Hanna Industries was quite different from LVCS's normal contract arrangement at the Convention Center. Specifically, Hanna informed LVCS that because of the complexity of the apparatus, it wished to supervise and control the dismantling operation itself. LVCS was merely to supply a crew of workers who, under Hanna's detailed direction, would dismantle the exhibits.

Clearly, Antonini remained in the employ of LVCS while he was dismantling the exhibit. He remained on the payroll of LVCS, and was originally hired by LVCS. LVCS retained the right to fire him. Similarly, Antonini's activities were in direct furtherance of LVCS's general business.

However, under the flexible approach enunciated in our prior cases, we conclude that an employment relationship also arose between Antonini and Hanna Industries. Control over

---

[6]Cf. Jackson v. Southern Pacific Company, 285 F.Supp. 388 (D. Nev. 1968), where a federal district court applying Nevada law held that an employee of the seller of a bridge who, as part of the contract of sale, was assigned to assist the buyer in dismantling the bridge, came under such operational control as to render him an employee of the buyer for workmen's compensation purposes. The court relied upon the buyer's right to "direct him as to what he was to do . . . the manner in which he was to do the work . . . [and] the right to dismiss him from working on the particular job or project." 285 F.Supp. at 390. The fact that, in rendering service to the buyer, the worker was also furthering the business interests of his original employer was not deemed relevant in determining whether a *new* and independent employment relationship had been established.

Antonini's activities was strictly and exclusively exercised by Hanna. Simon Service v. Mitchell, *supra;* Titanium Metals v. District Court, *supra.* Hanna retained the right to demand a replacement worker from LVCS if it became dissatisfied with Antonini. Such a demand would clearly have terminated Antonini's employment with LVCS under that particular contract, and thus constitutes a right to fire. McDowell Construction Supply Co. v. Williams, *supra;* Nevada Ind. Comm'n v. Bibb, *supra.* Although LVCS paid Antonini his wages, the source of those payments was Hanna, who paid LVCS for the workers it provided. Finally, Antonini's activities were clearly in furtherance of Hanna's regular business: the exhibit was in promotion of its business as a manufacturer of carwashes. Nevada Ind. Comm'n v. Bibb, *supra;* cf. Jackson v. Southern Pacific Company, *supra.* We find, therefore, that Hanna became Antonini's employer within the meaning of Ch. 616, NRS.

Antonini argues that the degree of control exercised by LVCS compels the conclusion that it, and not Hanna Industries, was his employer. However the concept of joint employment is accepted in Nevada, as it is in other jurisdictions. *See* Jackson v. Southern Pacific Company, *supra,* at 391, citing Famous Players Lasky Corp. v. Industrial Accident Commission, 228 P. 5 (Cal. 1924). In Beaver v. Jacuzzi Bros. (8th Cir. 1972), 454 F.2d 284, 285, the court stated: "As a matter of common experience and of present business practices in our economy, it is clear that an employee may be employed by more than one employer even while doing the same work." *See also* 1A Larson, supra, § 48.40, at 8-254. Antonini's continued employment relationship with LVCS in no way precludes another employment relationship, based upon identical activities, with Hanna Industries.

The tripartite relationship among Hanna, LVCS, and Antonini has been characterized in other jurisdictions as a "labor broker" relationship: the immediate employer LVCS contracted to provide workers for the customer Hanna, to be employed in the customer's business activities and under his direct supervision. Courts in other jurisdictions have concluded that an employment relationship results between the worker and the labor broker's customer.[7] Danek v. Meldrum Mfg. and

---

[7]In Renfroe v. Higgins Rack Coating & Manufacturing Co., 169 N.W.2d 326 (Mich.App. 1969), the court stated "The economic reality of this case is that both [the labor broker] and [the customer-contractee] were employers of [the injured worker], each in a different way. It is not necessary to make fine semantic distinctions as to types of degrees of control. It is enough to say that either could be liable under the workmen's compensation act. . . ." *See also* St. Claire v. Minnesota Harbor Service, Inc., 211 F.Supp. 521 (D.Minn. 1962).

Engineering Co., Inc., *supra;* Schwartz v. Riekes and Sons, *supra;* Beaver v. Jacuzzi Bros., *supra;* Wright v. Habco, Inc., *supra;* Daniels v. MacGregor Co., 206 N.E.2d 554 (Ohio 1965); Shipman v. Macco Corporation, 392 P.2d 9 (N.M. 1964). This new employment relationship is not inconsistent with the continued existence of an employment relationship with the labor broker. Smith v. Kelley Labor Service, 239 So.2d 685 (La.App. 1970).

We therefore conclude that Hanna Industries was Antonini's employer under the NIIA. As an employer, it is immune from third-party tort liability under NRS 616.370 and NRS 616.560.

II. *May Hanna be sued as a non-participating employer?*

Antonini alternatively argues that even if Hanna is an employer and is thus immune from third-party tort liability under NRS 616.370, he should nonetheless be able to maintain an action under the onerous penalty provision NRS 616.375. *See* Cahow v. Michelas, 62 Nev. 295, 149 P.2d 233 (1944).[8] Under this section, an employer who fails to provide and secure coverage under the Act may be proceeded against in tort, with the considerable burden of being deprived of all common law affirmative defenses and subjected to a presumption of negligence. Hanna concedes that it did not participate in the NIIA scheme by paying insurance premiums into the NIC Fund. Antonini concedes that he was in fact covered under the NIC policy of LVCS, and was accorded benefits under that policy by the NIC.

If Hanna, as Antonini's employer, had directly participated in the NIIA scheme through the payment of premiums to the State Fund, it would have been immune both from third-party tort liability under NRS 616.560 and non-participating employer liability under NRS 616.375. Simon Service v. Mitchell, *supra;* Frith v. Harrah's South Shore Corp., *supra.* This case, however, raises an issue of first impression in Nevada: whether, in a labor broker/joint employment situation, NIC recovery under the policy of the labor broker precludes a tort action under NRS 616.375 against a non-participating customer employer.

Under NRS 616.270(1), it is the duty of "every employer" to "provide and secure compensation according to the . . . provisions of [the NIIA]" for accidental injuries to employees aris-

---

[8]NRS 616.375 is reprinted in pertinent part at note 3, *supra.* Nevada, like many of its sister states, has elected to provide an inducement to employer participation in the NIIA scheme by subjecting them to the threat of a common law tort action in which they are deprived of all common law affirmative defenses in the event that they should elect not to participate. *See* 2A Larson, *supra,* § 67.10, at 12–32.

ing in the course of employment.[9] If an employer has in fact "provide[d] and secure[d]" compensation for an injured employee, he is "relieved from other liability for recovery of damages or other compensation. . . ." NRS 616.270.

Whether Antonini may proceed against Hanna under NRS 616.375 depends, therefore, upon whether Hanna has "provide[d] and secure[d] compensation" under NRS 616.270. Since Hanna admittedly was not a direct participant in the NIIA scheme, Antonini's success in this case depends upon whether LVCS's participation may be attributed to Hanna.

Our analysis of the NIIA and its underlying policies leads us to conclude that a contractee for labor services (the customer of the labor broker) has "provided and secured compensation" within the meaning of NRS 616.270 when the labor broker has paid NIC premiums and provided the joint employee with full coverage under the Act.

Several sound policy reasons militate in favor of this conclusion. First, the costs incurred by the labor broker in securing Nevada industrial insurance coverage will ultimately be borne by the customer-contractee as part of the contract price. *See* Fiscus v. Beartooth Electric, 522 P.2d 87 (Mont. 1974). In contrast to the uninsured employer, therefore, the customer-contractee has sustained a real cost directly attributable to participation in the NIIA scheme. This cost is borne by the customer-contractee to the same extent as if he had paid the premiums himself.

Second, there exists no rational policy in favor of requiring *both* employers in a joint employment situation to secure independent Nevada industrial insurance coverage.[10] Such a requirement would have as its only result the payment of two

---

[9]The Nevada Industrial Insurance Act, in contrast with many other workmen's compensation acts, thus imposes no primary liability upon any one of several *bona fide* employers. (*But see,* Stolte, Inc. v. District Court, 89 Nev. 257, 510 P.2d 870 (1973), where we held that in a situation involving a *statutory* employer such as a principal contractor, see NRS 616.085, such a principal contractor is primarily responsible for securing coverage.) In a joint employment situation involving two bona fide employers, the responsibility, and liability, of *each* employer is present and real, rather than secondary and latent. For this reason, those cases arising in other jurisdictions addressed to the tort immunity of a secondarily-liable "guarantor" statutory employer are of little guidance in determining the liability of a bona fide employer primarily liable for coverage. *See eg.,* Lindler v. District of Columbia, 502 F.2d 495 (D.C. Cir. 1974); Fonseca v. Pacific Construction Co., Ltd., 513 P.2d 156 (Haw. 1973).

[10]Since Nevada is one of the six states whose industrial insurance schemes are administered through a monopolistic state fund, *see* 4 Larson, *supra,* 92, at 17-2, there arise under the NIIA no questions of indemnification between the private insurers of various employers. *See eg.,* Drennon v. Braden Drilling Company, 483 P.2d 1022 (Kan. 1971).

premiums into the State Fund to cover an employee to the identical extent to which he would be covered if only one premium were paid. No additional benefit would inure to the employee by reason of such double coverage.

Third, there appears to be no policy against allowing joint employers to arrange between themselves, whether by explicit contract terms or through general business practice, for the coverage of a joint employee under the Act. Notably, the NIIA does allow an employer to "make arrangements" other than NIC coverage for the protection of his employees. See NRS 616.415. Such "arrangements", if satisfactorily concluded, will constitute full performance of the employer's duty to provide industrial accident insurance, and will confer a concomitant tort immunity upon the employer. While this section is admittedly addressed to an employer wishing to secure outside no-fault insurance protection, it evidences a policy in favor of allowing employers some flexibility in the manner in which they carry out their responsibility to "provide and secure compensation." Such policy is not offended by an arrangement between two employers, jointly subject to NRS 616.375 in the event that no coverage is secured, to assign to one or the other party the duty to secure coverage through the payment of premiums into the NIIA scheme.

We therefore interpret NRS 616.270 to mean that in a labor broker/joint employment situation, a customer-contractee may fulfill his responsibility to "provide and secure compensation" through an arrangement with the labor broker to the effect that the latter will pay premiums to the Nevada Industrial Insurance Fund. And, as the Federal District Court for the District of Puerto Rico stated in a related context, "[t]he type or kind of action taken by the principal employer to make sure that his independent contractor has complied with the Act is immaterial. . . . It makes no difference whether he so explicitly demanded in the contract . . . or whether the latter did so voluntarily as an ordinary custom in the industry." Lopez-Correa v. Marine Navigation Co., 289 F.Supp. 993, 999–1000 (D.P.R. 1968). Failure of the labor broker to secure coverage under the Act will of course result in the liability of either or both employers under NRS 616.560. Cf. Hobelman v. Mel Krebs Construction Company, 366 P.2d 270 (Kan. 1961). However, when the labor broker has in fact secured full coverage for the injured employee through the payment of premiums into the Fund, the compensatory purposes of the Act have been fulfilled, and such full coverage will immunize both employers from tort liability.

Affirmed.