880 P.2d 717

**Jesus AVILA and Maria Avila, husband and wife, Plaintiffs–Appellants,**

v.

**NORTHRUP KING COMPANY, a Delaware corporation doing business in Arizona, Hector Villareal and Jane Doe Villareal, husband and wife, Defendants–Appellees.**

**No. 1 CA–CV 91–0469.**

Court of Appeals of Arizona, Division 1, Department B.

March 29, 1994.

Review Denied Sept. 20, 1994.

---

Mower, Koeller, Nebeker & Carlson by Constance J. Miller, Yuma, for plaintiffs-appellants.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, P.A. by Steve D. Smith and William A. Cirignani, Phoenix, for defendants-appellees.

## OPINION

TOCI, Judge.

Edward Montiel owns a business ("EMCO") that provides contract labor and services to farmers and agricultural growers. EMCO assigned Jesus Avila to work for Northrup King Company ("Northrup") as a temporary employee. Avila was injured while working under Northrup's direction and control. After receiving workers' compensation benefits from EMCO, Avila sued Northrup for negligence. The trial court granted summary judgment for Northrup on the theory that Avila's status as a loaned employee renders Northrup immune from suit.

There are two issues before us. First, do the undisputed facts in the record support the trial court's summary judgment that because Northrup was Avila's special employer, it was immune from civil suit? The answer to this question depends upon whether Avila, by accepting the assignment from EMCO, and by submitting to Northrup's control, direction, and supervision, impliedly consented to Northrup as his temporary employer. Second, assuming that Northrup was Avila's special employer, is Northrup entitled to immunity from civil suit notwithstanding the fact that EMCO provided the workers' compensation coverage for EMCO employees?

In resolving the above issues, we conclude first that under the standard pronounced in *Orme School v. Reeves*, 166 Ariz. 301, 802 P.2d 1000 (1990), the trial court properly granted summary judgment in favor of Northrup. On the basis of the evidence presented to the trial court, a reasonable juror could conclude only that Avila impliedly consented to the employment relationship with Northrup. Thus, Avila was a "lent employee." For that reason, and because Northrup provided workers' compensation coverage for its own employees that would have covered Avila had he filed a claim against it, Northrup was entitled to Ariz.Rev.Stat.Ann. ("A.R.S.") section 23–1022(A) (Supp.1993) immunity as a matter of law. Accordingly, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

Montiel, doing business as EMCO, is a United States Department of Labor licensed labor contractor who contracts to provide agricultural labor and services to growers and farmers in the Yuma, Arizona area. At the time of Avila's injury, EMCO had a work force of approximately 150 to 160 people who worked for one or more of five growers during the growing season. EMCO charged growers the amount of the wages it paid to each assigned worker plus a 32% mark-up to cover payroll taxes, workers' compensation premiums, and general overhead. If a grower for whom EMCO provided services was dissatisfied with a particular laborer's work, the grower did not have the right to discharge the laborer from EMCO's work force, but could discharge him from the particular job. When this happened, EMCO would not send that laborer back to that job, and would exercise its discretion about whether to assign the worker to any other jobs.

One of the agricultural companies to whom EMCO supplied labor was Northrup. EMCO owner, Montiel, testified at his deposition that Northrup typically asked EMCO for small groups of laborers without a foreman, usually for not more than three or four days at a time. Montiel also testified that such employees were under the direct supervision of Northrup:

They [Northrup] don't justify paying $65 a day for a foreman for a small group of people when they have their own foreman on staff....

So my supervisor delivers the people or sends the people, sets them up with the water and sanitation facilities, and they go to work under the leadership or the foremanship of the Northrup King supervisor.

....

... Because you see, when we give Northrup King those 4 individuals, I say 4, we are assigning them to Northrup King. Hector [Villareal] tells them come back tomorrow. Tomorrow don't come here, go to this end of the field, do this or that.

Everyday he directs them because that's our arrangement. He acts as the foreman. The work quality and the performance of the job, they have to answer to him. My supervisor might call Hector and say, "Hector, is everything going okay? Any problem with Jesus or Juan or Jose?" And he may say, "No, they are working good. No problems."

It's our duty to check back with him. Not necessary that we talk to people....

Under the agreement between EMCO and Northrup, Northrup controls the details of the work done by the EMCO workers. When the EMCO employees arrive at the field, Northrup's field supervisor, Hector Villareal, relays the Northrup management's instructions to them. Villareal tells the workers what Northrup wants to do that day and how it is to be done. If tools and training are necessary to complete the assignment, Northrup provides both. When EMCO's employees are working in Northrup's field, Villareal is present at all times supervising and giving directions about where to work and what to do.

Avila became a direct employee of EMCO in approximately March of 1987. Avila performed pre-harvesting and harvesting field work consisting of hoeing, weeding, cutting, picking, packing, and driving a tractor. During the year preceding the accident, EMCO had assigned Avila to work for Northrup on a number of separate occasions. On each prior occasion, Avila was overseen by Northrup's supervisor, Villareal.

On March 22, 1988, Villareal called Tranquilino Vecerra, Avila's supervisor at EMCO, and told him that Northrup needed two people to hoe weeds. Villareal did not ask for particular people or specify how long they would be working. On March 23, 1988, at 6:00 a.m., Avila and another person arrived at Northrup's field in their own cars. Villareal provided them with hoes. Villareal testified at his deposition as follows:

Q. What instructions did you give them that morning, do you recall?

A. I told them we were going to hoe some weeds on squash and melons and I showed them how to get the weeds from underneath plants and look under plants and most of the weeds be thrown down in the furrow.

Q. And once those general instructions were given to them did they need any further instructions after that?

A. No, just to keep going on all the things that I showed them where to hoe. I stayed there with them for a little while and then I had to do some other things and I came back after awhile [sic].

Q. Did you periodically just come and go to check on them?

A. Yes.

That same day, EMCO's supervisor, Vecerra, dropped by on one occasion to talk with Villareal and the workers.

The following day, while hoeing an experimental squash crop, Avila was stung by a bee. Because Avila is highly allergic to bee stings, he asked Villareal to take him back to Northrup's shop so he could go home for the rest of the day. While Villareal was driving Avila back to the shop on a tractor, Avila fell from the tractor and was injured.

After obtaining workers' compensation benefits from EMCO's compensation carrier, Avila brought this negligence action against Northrup and Villareal. The trial court granted summary judgment in favor of both. It concluded that on the evidence presented, reasonable minds could not disagree that Avila was a lent employee of Northrup entitled to the immunity provided by A.R.S. section 23-1022(A). The trial court stated:

Avila's acceptance of EMCO's assignment to be supplied as an employee to N–K and his acceptance of the direction, control and supervision by Hector Villareal, foreman and supervisor of N–K was sufficient to imply the consent required for the establishment of an employment relationship between Avila and N–K for the hoeing task being performed. When he arrived at the work site and N–K directed and controlled his work and he accepted such direction and control, the legal relationship was established as a matter of law.

Avila filed a timely appeal. We have jurisdiction pursuant to A.R.S. section 12–2101(B) (Supp.1993).

## II. DISCUSSION

### A. Was Avila a "Lent Employee?"

 Any inquiry concerning the "lent employee" doctrine in the workers' compensation setting begins with *Word v. Motorola, Inc.*, 135 Ariz. 517, 662 P.2d 1024 (1983). There, our supreme court stated:

The factors to be considered in determining when a lent employee has become the employee of the special employer are set out in Larson. We quote them with approval:

When a general employer lends an employee to a special employer, the special employer becomes liable for workmen's compensation only if

(a) the employee has made a contract of hire, express or implied, with the special employer;

(b) the work being done is essentially that of the special employer; and

(c) the special employer has the right to control the details of the work.

When all three of the above conditions are satisfied in relation to both employers, both employers are liable for workmen's compensation.

When these factors are met, the "special employer" becomes an "employer" and, like other employers liable for workmen's compensation, may be entitled to the benefit of the statutory immunity given complying employers.

*Id.* at 520, 662 P.2d at 1027 (quoting 1C Arthur Larson, *Larson's Workmen's Compensation Law,* § 48.00 (1982)) (current version at 1B Arthur Larson, *Larson's Workmen's Compensation Law,* § 48.00 (1993) (citation omitted)); *see also Lindsey v. Bucyrus–Erie,* 161 Ariz. 457, 459, 778 P.2d 1353, 1355 (App.1989); *Nation v. Weiner,* 145 Ariz. 414, 417, 701 P.2d 1222, 1225 (App.1985).

Avila argues that issues of fact exist whether any of the three criteria of the "lent employee" doctrine adopted by our supreme court in *Word* were met in this case. *See generally Orme School,* 166 Ariz. at 309, 802 P.2d at 1008. We disagree. On this record, it is undisputed that the work done by Avila was the work of the special employer, Northrup, rather than that of EMCO. Likewise, no dispute exists that Northrup had the right to control the details of the work Avila was performing when he was injured. Finally, Avila's consent to the employment relationship with Northrup can be implied from his submission to Northrup's direction and control. Consequently, we hold that as a matter of law Northrup was Avila's special employer.

### 1. Northrup Had the Right to Control Details of the Work

We first address the third factor in *Word:* whether Northrup had the right to control the details of Avila's work the day he was injured. In determining whether an employer has the right to supervise and control the method of reaching a specific result, we must consider:

[T]he duration of the employment; the method of payment; who furnishes necessary equipment; the right to hire and fire; who bears responsibility for workmen's compensation insurance; the extent to which the employer may exercise control over the details of the work, and whether the work was performed in the usual and regular course of the employer's business. In undertaking an analysis none of the indicia is, in itself, conclusive.

*Home Ins. Co. v. Industrial Comm'n,* 123 Ariz. 348, 350, 599 P.2d 801, 803 (1979) (citations omitted).

Here, Villareal testified that when Avila arrived at the field he submitted himself to Northrup's supervision. Villareal furnished Avila with a hoe, told him where and how to weed and what to do with the weeds once they were removed from the ground. Avila did exactly as Villareal instructed. Although Avila also considered himself subject to direction from his EMCO supervisor, Northrup's supervisor had the primary right to supervise and control the details of Avila's work at the time he was injured. *See Carnes v. Industrial Comm'n,* 73 Ariz. 264, 270, 240 P.2d 536, 540 (1952) (for lent employee doctrine to apply, special employer's right to control the employee's work need not be exclusive, merely "primary").

In addition, Avila did the weeding work in the regular course of Northrup's business of raising an experimental squash crop. Although Northrup had no right to discharge Avila from his employment with EMCO, Northrup undisputedly had the right to terminate him from the particular job he was doing for Northrup that day. *See Antonini v. Hanna Indus.,* 94 Nev. 12, 573 P.2d 1184, 1187 (1978) (special employer's right to demand replacement for employee terminates employee from employment on temporary job and thus qualifies as right to fire for purpose of determining right to supervise and control work). On this record, no reasonable person could conclude that Northrup lacked the right to control the details of Avila's work.

### 2. Avila Was Doing Northrup's Work

Avila also contends that an issue of fact exists concerning the second factor in *Word:* whether the work Avila was doing when he was injured was that of the special employer, Northrup. Avila argues that because the work furthered EMCO's commercial activities as an independent contractor, it was essentially that of EMCO, not of Northrup. We disagree. Although EMCO may have functioned as an independent contractor for its other growers, it did not act in that capacity when it provided small crews of workers for Northrup.

The evidence is uncontradicted that in its dealings with Northrup, EMCO supplied Northrup with an unsupervised work group that both EMCO and Northrup expected would be directed by Northrup's supervisor. Avila was a member of one of those crews. He worked under the supervision of Northrup's field supervisor, Villareal, and carried out his directions in removing weeds from Northrup's experimental crop. On this record, no reasonable person could find that this work was anything other than Northrup's work.

### 3. Avila's Consent to Employment

We now consider the first factor stated in *Word:* whether the record establishes as a matter of law that Avila has made an express or implied contract of hire with the special employer. We begin the inquiry by making several general observations about the lent employee doctrine.

■ First, the requisite consent to a contract of hire between Avila and Northrup can be implied from the circumstances. *See Nation,* 145 Ariz. at 419, 701 P.2d at 1227; *Word,* 135 Ariz. at 519 n. 4, 662 P.2d at 1026 n. 4; *DeVall v. Industrial Comm'n,* 118 Ariz. 591, 592, 578 P.2d 1020, 1021 (App.1978). A contract of hire is implied when the employee accepts (1) the general employer's assignment to work with the special employer, and (2) control, direction and supervision by the special employer. *Lindsey,* 161 Ariz. at 459, 778 P.2d at 1355. Such acceptance, even for a short time, is sufficient to imply consent.

■ Second, a distinction exists between an employer who borrows an employee from a general employer not in the business of furnishing temporary employees to others and an employer who obtains workers from the so called "labor contractor." The latter term is used to describe a business that hires employees and in effect sells their services to other secondary employers who are in need of temporary assistance. *Miller v. Federated Mut. Ins. Co.,* 264 N.W.2d 631, 634 (Minn. 1978). Thus, "[t]he broker is paid directly by these special employers, and in turn pays each of its employees a fixed wage." *Id.* The usual rule is that the employer obtaining workers from a labor contractor is held to assume the status of special employer, and

with it immunity from civil suit. *See Nation*, 145 Ariz. at 419–20, 701 P.2d at 1227–28; *Word*, 135 Ariz. at 520 n. 5, 662 P.2d at 1027 n. 5; *Lindsey*, 161 Ariz. at 458, 778 P.2d at 1354. Thus, in the majority of such cases the employee has been found to be a borrowed servant and thus precluded from maintaining a tort action against the special employer. 1B Larson, *supra*, § 48.23 n. 65; *Word*, 135 Ariz. at 520 n. 5, 662 P.2d at 1027 n. 5; *Nation*, 145 Ariz. at 419–20; 701 P.2d at 1227–28.

Here, undisputed evidence establishes that EMCO is in the business of providing temporary labor to farmers and growers in the Yuma area. EMCO is licensed by the United States Department of Labor to "recruit, solicit, furnish, hire, and employ" migrant farm workers. EMCO hires the workers and ordinarily buses them to the work site. Before they get on the bus, the workers are informed where they will be working and how much they will earn. Because the workers do not appear at EMCO's office, the workers' compensation notices and other applicable laws and regulations relating to employment are posted in the bus.

Under EMCO's agreement with Northrup, EMCO "delivers the people ... and they go to work under the leadership or foremanship of the Northrup King supervisor." No foreman is provided by EMCO because "they don't justify paying $65 a day for a foreman for a small group of people when they have their own foreman on staff." EMCO charges Northrup the amount of wages paid the employee plus 32% to cover payroll taxes and general overhead. Under these facts, no reasonable juror could conclude that EMCO is not a labor contractor. Consequently, *Nation, Lindsey*, and other similar cases are controlling here.[1]

Avila argues, however, referring to footnote 5 in *Word*,[2] that under *Lindsey* the lent employee doctrine does not apply unless the employer is of the "Manpower" type of employer. He defines such employer as one with whom the employee has an express consensual agreement for the brokering of the employee's services. Avila contends, in effect, that *Nation* and *Lindsey* are distinguishable because in each of those cases the employee knew that he was employed by a labor contractor and thus agreed in advance to being "loaned." Avila argues that because he did not know the terms of the agreement between EMCO and Northrup, he cannot be a lent employee. We reject these arguments for the following reasons.

First, we do not read *Nation or Lindsey* as narrowly as Avila does. Although the court in *Lindsey*, 161 Ariz. at 458, 778 P.2d at 1354, mentioned that Lindsey's agreement with his employer gave him the right to *refuse* an assignment, the case did not turn on the employee's contractual relationship with the general employer. Instead, the holding in *Lindsey* is based on the employee's consent to the assignment and his submission to the "control, direction and supervision" of the special employer. *Id.* at 459, 778 P.2d at 1355. *Nation* also involved a general employer in the business of contracting the services of temporary employees. Nevertheless, as in *Lindsey*, our holding in *Nation* was not based on the nature of the relationship between the general employer and the employee. Instead, we concluded that Nation's implied consent to Phoenix General as her special employer was based upon her "acceptance of the special employer's control and direction." *Nation*, 145 Ariz. at 419, 701 P.2d at 1227.

■ Second, Avila is mistaken in the view that the lent employee doctrine applies only

1. *See Simmons v. Atlas Vac Mach. Co.*, 493 F.Supp. 1082 (E.D.Wis.1980); *Rumsey v. Eastern Distribution, Inc.*, 445 So.2d 1085 (Fla.Dist.Ct. App.1984); *Fox v. Contract Beverage Packers, Inc.*, 398 N.E.2d 709 (Ind.Ct.App.1980); *Renfroe v. Higgins Rack Coating & Mfg. Co., Inc.*, 17 Mich.App. 259, 169 N.W.2d 326 (1969); *Danek v. Meldrum Mfg. & Eng'g Co., Inc.*, 312 Minn. 404, 252 N.W.2d 255 (1977); *Campbell v. Central Terminal Warehouse*, 56 Ohio St.2d 173, 10 O.O.3d 342, 383 N.E.2d 135 (1978); *English v. Lehigh*

*County Auth.*, 286 Pa.Super. 312, 428 A.2d 1343 (1981).

2. Footnote 5 states: "In cases specifically involving labor contractors, the usual rule is that 'employers obtaining workers from the kind of labor service typified by Manpower, Inc. have usually, but not invariably, been held to assume the status of special employer.'" *Word*, 135 Ariz. at 520 n. 5, 662 P.2d at 1027 n. 5.

where the general employer is a labor contractor. *Word,* 135 Ariz. at 519 n. 4, 662 P.2d 1026 n. 4 (citing *Gaudet v. Exxon Corp.,* 562 F.2d 351 (5th Cir.1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2253, 2254, 56 L.Ed.2d 414 (1978)); 1B Larson, *supra,* § 48.11, at 8–434. As we discuss above, many lent employee cases arise from labor broker or temporary services arrangements. But neither *Word* nor the formulation of the lent employee doctrine it adopted from Larson establish any such limitation.

Furthermore, in the non-labor contractor cases, where an employer merely loans an employee and does not provide special equipment, the majority rule is that the loaned employee becomes the employee of the special employer. 1B Larson, *supra,* § 48.23, at 8–515. Consequently, even in the absence of a labor contractor relationship between EMCO, Avila, and Northrup, substantial precedent exists for holding that Avila is a lent employee of Northrup.

■ Finally, for the lent employee doctrine to apply, the employee need only be aware of and consent to the facts that give rise to the lent employee relationship. He need not be aware of and consent to the legal consequences of such facts. *Six Flags Over Georgia, Inc. v. Hill,* 247 Ga. 375, 276 S.E.2d 572, 575 (1981). There, a contractor who had constructed an amusement ride loaned its ironworker to the amusement park company to make repairs to the ride. While under the supervision of the amusement park, the worker was injured. He sued Six Flags for negligence, but the trial court granted summary judgment against him. The Georgia Court of Appeals reversed the trial court's grant of summary judgment, holding that the employee did not have notice of the lent employee relationship and thus did not agree to it. *Id.,* 276 S.E.2d at 575. In reversing the court of appeals and reinstating the trial court's award of summary judgment for Six Flags, the Georgia Supreme Court said:

In this case, Hill admits notice of and assent to the facts creating the special relationship. It is not necessary that the borrowed servant be on notice of and give his assent to the legal consequences of the special relationship where he has notice of the necessary facts and assents to perform the work at the direction and under the control of the special master.

*Id.* at 575; *see also Beach v. Owens–Corning Fiberglas Corp.,* 542 F.Supp. 1328, 1330 (N.D.Ind.1982) (although employee never thought he was employed by special employer, his acquiescence in special employer's direct supervision was sufficient for an implied contract of hire); *Santa Cruz Poultry, Inc. v. Superior Court,* 194 Cal.App.3d 575, 239 Cal.Rptr. 578, 583 (1987) (employee's consent to the status of special employee inferred from the employee's submission to the control and direction of the special employer); *A.J. Johnson Paving Co. v. Industrial Comm'n,* 82 Ill.2d 341, 45 Ill.Dec. 126, 131, 412 N.E.2d 477, 482 (1980) (consent established by employee's knowledge that job was being performed by special employer and by acceptance of special employer's control by following directions as to performance of the work).

■ From the evidence presented to the trial court in this case, reasonable persons could only conclude that Avila was a loaned employee of Northrup. Avila accepted EMCO's assignment to work at Northrup's field, just as he had done on numerous occasions during the preceding year. While working there, Avila submitted to Northrup's control, direction and supervision through its field supervisor, Villareal. The fact that Avila thought that he was at all times a direct employee of EMCO and subject to his EMCO supervisor's authority did not raise a contrary inference. *See Nation,* 145 Ariz. at 417, 701 P.2d at 1225.

■ Avila contends that reasonable minds could differ concerning whether he was a lent employee, a statutory employee,[3]

---

**3.** An employer is a worker's "statutory employer" under A.R.S. section 23–902(B) (1983) if the worker is a direct employee of a contractor whom another employer procured to do work for him, the other employer retains supervision or control over the work, and the work is a part or

process of the trade or business of the other employer. *Word,* 135 Ariz. at 518–19, 662 P.2d at 1025–26; *Young v. Environmental Air Products, Inc.,* 136 Ariz. 158, 164–65, 665 P.2d 40, 46–47 (1983).

or the employee of an independent contractor. He cites *Santiago v. Phoenix Newspapers, Inc.*, 164 Ariz. 505, 794 P.2d 138 (1990), for the proposition that the existence of an employment relationship is always a question of fact rather than a matter of law. We disagree. Although *Santiago* holds that the existence of an employer-employee relationship is one for the trier of fact in that particular case, it does not establish a bright-line rule for all cases. *Id.* at 513, 794 P.2d at 146. Where the facts of employment are undisputed, as in this case, the existence of an employment relationship is a matter of law. *Santa Cruz*, 239 Cal.Rptr. at 584 (citing *In-Home Supportive Serv. v. Workers' Compensation Appeals Bd.*, 152 Cal.App.3d 720, 199 Cal.Rptr. 697, 702 (1984)); *see Nation*, 145 Ariz. at 418, 701 P.2d at 1226. Nothing in this record creates a disputed fact issue about Avila's status either as a statutory employee or as the employee of an independent contractor.

The dissent argues, citing 1B Larson, *supra*, § 48.11-12, that a "deliberate and informed consent" by the employee is required before a special employment relationship can arise. Building on this proposition, the dissent asserts that a conclusive inference of a new hire cannot be inferred merely by Avila's showing up at Northrup's field and following the direction of a Northrup employee. The dissent contends that because EMCO normally operates as a contract harvester, rather than as a labor broker, and that because on the day of the accident Avila did not expressly agree to a different relationship, a disputed issue of fact exists. This analysis is flawed for several reasons.

First, as we discuss above, Arizona law is contrary to the dissent's quoted statement from Larson that deliberate and informed consent by the employee is necessary to create a special employment relationship. *See Lindsey*, 161 Ariz. at 459, 778 P.2d at 1355 (consent implied from acceptance of assignment from general employer and acceptance of control and direction of special employer). Second, it is irrelevant whether EMCO normally did business as a contract harvester, or on other occasions furnished both workers and supervision to Northrup. The evidence is undisputed that on the day of the accident EMCO acted as a labor contractor and assigned Avila to work for Northrup. Avila accepted EMCO's assignment to work in Northrup's field and Northrup's direction, control and supervision.

The dissent also cites Larson, *supra*, § 48.14, for the proposition that there is a presumption that an existing employment relationship continues. That presumption, however, only arises where the employee attempts to hold a particular employer liable for workers' compensation benefits. It does not apply where, as in this case, an employee who has workers' compensation coverage seeks to hold a particular employer liable as a third party. *See* Larson, *supra*, § 48.14, at note 37.1 (citing *Ruble v. Arctic Gen., Inc.*, 598 P.2d 95 (Alaska 1979)). That case states the rule as follows:

> Thus, there are neither presumptions for or against finding tort liability on behalf of a third party, nor presumptions for or against finding an employment relation with respect to a particular employer.

*Ruble*, 598 P.2d at 97 (footnote omitted). Furthermore, even a presumption of continued employment would make no difference in this case. Avila's continued employment with EMCO does not preclude a special employment relationship with Northrup. *See Nation.*

**B. Northrup King's Entitlement to Immunity Under A.R.S. Section 23–1022(A)**

Finally, Avila argues that Northrup was not entitled to immunity pursuant to A.R.S. section 23–1022(A) because it failed to show it had provided workers' compensation insurance that would have covered Avila. We reject this argument because it is undisputed that Northrup provided workers' compensation coverage for its own employees. As we held in *Nation*, 145 Ariz. at 419, 701 P.2d at 1227, pursuant to A.R.S. section 23–963 (Supp.1993), this coverage extended as a matter of law to Avila, and Northrup's insurance carrier would have been liable for benefits had Avila filed a compensation claim against Northrup rather than EMCO. Accordingly, Northrup was entitled to A.R.S.

section 23–1022(A) immunity as a matter of law.

The exclusivity of workers' compensation coverage as a remedy is based on the existence of an employment relationship. That relationship exists between Avila and two employers—Northrup and EMCO. The fact that Avila chose not to make his workers' compensation claim against Northrup is irrelevant—he could have—and Northrup would have been obligated to pay benefits. Avila has received the quid pro quo that justifies loss of the right to reap the benefits of a common law negligence action against Northrup. Thus, both his general and special employer are entitled to immunity under A.R.S. section 23–1022(A).

## CONCLUSION

For the reasons stated above, the trial court properly granted summary judgment in favor of EMCO and Villareal.

CONTRERAS, J., concurs.

JACOBSON, Presiding Judge, dissenting.

The majority finds no material issue of disputed fact in holding that Northrup was Avila's "special employer," thus affording to Northrup the statutory immunity from common law negligence liability to its "employees."

Let me first deal with the policy considerations that the majority contends support the result it reaches. The first is that, because of the agreement between EMCO and Northrup, Northrup indirectly paid the cost of Avila's workers' compensation coverage and, "[t]hus, Avila's suit against Northrup is essentially a suit against the entity that indirectly paid his worker's compensation premiums." Op. at 506, 880 P.2d at 725. However, this is a *non sequitur.* In order for Northrup to obtain EMCO services, it was required to pay insurance coverage for *EMCO's employees,* not its own. As between the principals, the shared cost of performance does not indicate a policy reason for depriving Avila of his statutory right to maintain his common law negligence action. In any event, if Avila is successful, the workers' compensation carrier is entitled to reim-

bursement for all sums expended, A.R.S. § 23–1023(C), thus making whole the entity that "paid his worker's compensation premiums."

The second policy consideration, i.e., exclusivity of workers' compensation as a remedy, is absolutely correct—if Northrup was Avila's employer; if not, A.R.S. § 23–1023(A) gives Avila the public policy stated reason for pursuing his action—that is, his injuries were caused by the negligence of a third party. There is nothing in the workers' compensation scheme that affords protection to a stranger for negligent infliction of injuries. Thus, the inquiry must focus on this determination.

The majority correctly sets forth the law in relation to lent employees or "special employers." I zero in on the first of the findings that is necessary in order for special employers to become liable for workers' compensation:

(a) the employee has *made a contract of hire,* express or implied, with the special employer. . . .

*Word v. Motorola, Inc.,* 135 Ariz. 517, 520, 662 P.2d 1024, 1027 (1983) (emphasis added).

The law, again as correctly cited by the majority, is that where an employer obtains workers from a labor contractor, that employer assumes the status of a special employer and, with that status, immunity from civil suit. *See* op. at 502, 880 P.2d at 722. These cases recognize the relationship that the employee holds with the labor contractor. In its inception, the employee knows that the labor contractor does not itself perform the tasks for which the employment was undertaken, but rather those tasks are going to be performed for another. Thus, by performing the tasks for another, the employee is assumed to have agreed to a contract of hire with that third party.

However, these are assumptions that should not be entered into lightly. As Larson points out, the first question to be asked in the "lent employee" situation is: "Did he make a contract of hire with the special employer? If this question cannot be answered 'yes,' the investigation is closed, and there is no need to go on into tests of relative

control and the like." Larson then explains the importance of this threshold inquiry:

> This must necessarily be so, since the employee loses certain rights along with those he gains when he strikes up a new employment relation. Most important of all, he loses the right to sue the special employer at common law for negligence; and when the question has been presented in this form, the courts have usually been vigilant in insisting upon a showing of a deliberate and informed consent by the employee before employment relation will be held a bar to common-law suit.

1B Arthur Larson, *Workmen's Compensation Law*, § 48.11–12 (1993).

It is at this juncture that I part company with the majority—not on its understanding of the law, but on its understanding of the facts. The majority concludes that the "undisputed evidence establishes that EMCO is in the business of providing temporary labor to farmers and growers in the Yuma area." Op. at 503, 880 P.2d at 723. This is true. However, the majority's conclusion that "[u]nder these facts, no reasonable juror could conclude that EMCO is not a labor contractor," op. at 503, 880 P.2d at 723, in the sense that "labor contractor" is used in *Nation, Lindsey,* and *Word,* may or may not be true.

What the facts show here is that EMCO is more than simply a labor contractor that supplies labor to farmers. Rather, it is in the business of contract harvesting: it moves onto the farmer's land, with crews, supervisors, equipment including toilets, water, ice, buses, tractors, and hoes, and performs all preharvesting and farming work. In this normal operation, its employees are never considered to be "lent employees" because they are at all times under the direct control and supervision of EMCO. This was generally how Avila's employment with EMCO was conducted.

What makes this case difficult from the special employers' standpoint is Northrup's contract with EMCO. Northrup is a grower in Yuma that maintains an experimental seed plot. Because of the limited size of this operation it does not need the full services of EMCO, including its supervisory personnel, at all times. Rather, the oral contract between EMCO and Northrup provided that, if less than fifteen laborers were needed by Northrup to perform a specific task, EMCO would not supply supervisory personnel; instead, Northrup's field hand would be available for temporary supervision. However, if the task required by Northrup entailed more than fifteen laborers, EMCO would provide its own supervision.

On the day Avila was injured, he was part of a crew of less than fifteen laborers and therefore was under the direction of a Northrup employee. However, his modus operandi for that day was the one he usually followed since his employment by EMCO. He reported to his supervisor at EMCO who directed him to report, with one other laborer, to Northrup. There he was given direction by a Northrup employee as to the tasks to be performed.

There is no question that Avila was not aware of the contractual agreement between his general employer, EMCO and Northrup, nor did he specifically enter into a contract of hire with Northrup, always thinking of himself an EMCO employee.

It is true as pointed out by the majority that the "consent to hire" requirement maybe satisfied by the circumstances under which the employee undertakes the direction and control of the special employer, and that "lent employees" are not limited to "labor contractor" cases. However, given the circumstances of Avila's employment with EMCO, EMCO's general harvesting business and the special nature of the contractual relationship with Northrup, a conclusive inference of a new hire cannot be inferred merely by Avila's showing up at Northrup's field and following the direction of Northrup's employee. This was exactly what he was told to do by his general employer, EMCO.

It is important to keep in mind Larson's observation that an analysis of the "lent employee" problem begins by acknowledging that an existing employment relationship exists, and that it is presumed that this existing employment relationship continues.

To overcome this presumption, it is not unreasonable to insist upon a clear demonstration that a new temporary employer has been substituted for the old, which demonstration should include a showing that a contract was made between the special employer and the employee.

. . . . .

Larson, *supra*, at § 48.14.

In my opinion, not only has a clear demonstration not been made that Avila entered into a new contract of hire with Northrup, but a serious factual dispute exists as to this issue. I would reverse to allow a trier of fact to resolve this dilemma.